FIRST DIVISION

December 30, 1999

Nos. 1-98-1220 and 1-98-2576

(Consolidated)

MARILEE SEEF AND MICHAEL SEEF, Indiv. and as Special Adm’rs of the Estate of Baby Boy Seef, Deceased,

Plaintiffs-Appellants,

v.

INGALLS MEMORIAL HOSPITAL AND ADA SUTKUS, as Special Adm’r of the Estate of Dr. Frank Sutkus, Deceased,

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Richard J. Elrod,

Judge Presiding.

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiffs Marilee and Michael Seef filed a medical malpractice action against defendants Ingalls Memorial Hospital and Dr. Frank Sutkus to recover damages for the wrongful death of their son.  Plaintiffs appeal from the circuit court’s order dismissing the hospital as a defendant and from the court’s judgment on the jury verdict in favor of Dr. Sutkus.  We affirm the dismissal of Ingalls Memorial Hospital and reverse and remand for a new trial with regard to Dr. Sutkus.

Mrs. Seef became pregnant in 1979 and was treated prenatally by Dr. Sutkus throughout her pregnancy.  Mrs. Seef’s estimated delivery date was June 7, 1980.   On a prenatal visit that Mrs. Seef made to Dr. Sutkus on June 9, 1980, the doctor found nothing unusual.  On June 10, 1980, Mrs. Seef ran a fever of 103.6 degrees and had chills.  She called Dr. Sutkus that evening and he ordered her to go to the hospital.  Just before Mrs. Seef left home for the hospital, her water broke.  At approximately 10 p.m. that evening, Mrs. Seef was admitted to Ingalls Memorial Hospital.  Her temperature at the hospital was 99.4 degrees.  Dr. Sutkus went to the hospital after he had been notified of Mrs. Seef’s arrival and was examining her by 10:30 p.m.  

Due to Mrs. Seef’s temperature fluctuations and a fetal heart rate within the upper limits of normal range, Dr. Sutkus ordered that an external fetal monitor be applied to track contractions and fetal heart rate.  The monitor was applied at 11:45 p.m. and run at one centimeter per minute.  Dr. Sutkus testified later that a monitor strip is routinely run between one centimeter and three centimeters per minute, and that Ingalls Memorial Hospital ran its monitors at one centimeter per minute in order to save paper.  Running the monitor at three centimeters per minute expands the configuration of the tracing and allows a greater clarity of interpretation of the fetal heart rate and contractions.  Dr. Sutkus testified that he customarily watched approximately 15 to 20 minutes of the strip and saw nothing here that alerted him to any problems.  He went to a doctors’ lounge 10 feet away from Mrs. Seef’s room to rest.  Dr. Sutkus did not see Mrs. Seef again until 3:05 a.m., when he was woken by a call from a nurse.  Between the time that Dr. Sutkus retired to the lounge and when he saw Mrs. Seef at 3:08 a.m., the nursing staff monitored Mrs. Seef’s labor.  At 3:08 a.m., Dr. Sutkus examined the latest monitor strips and found abnormalities which caused him some concern.  He applied an internal monitor to the fetus and, based on those readings, decided to perform an emergency caesarean section (C-section).  The baby was stillborn.  

Although Dr. Sutkus did not see anything indicating an infection during the C-

section, he did take a culture sample from Mrs. Seef’s placenta.  The culture developed to show that Mrs. Seef had a staphylococcus aureus (staph) infection.  An autopsy was performed on the baby and it was determined that the cause of death was intrauterine anoxia or lack of oxygen.  No cultures were taken from the baby so no determination could be made as to whether he was infected as well.  

In his 1984 deposition, Dr. Sutkus testified that, prior to 3:05 a.m., the monitor strips had shown a few fetal heart rate irregularities but that the fetus had recovered each time.  He testified that, even if he had seen the monitor strips prior to 3:05 a.m., he would not have done anything differently.  The following colloquy occurred during the deposition:

“Q. Was there anything on any of those sheets, that is those fetal monitor sheets or strips, however you want to call them, that would have caused you to do something to help this child had you not been napping and had you been aware of what was transpiring on those fetal monitor strips?

A. No

Q. So everything was okay up to 3:05 a.m. as far as you’re concerned, correct?

A. Yes, acceptable.

Q. Acceptable.  Does that mean that there was some deviation that might cause some concern but you didn't feel it was sufficient?

A. Not sufficient to act.

Q. To act.  It would just call for watchful waiting; is that what you mean?

A. That’s correct.

Q. At 3:05 a.m. wasn't it already too late to do anything?

A. In retrospect, yes.”

Plaintiffs originally filed suit on November 16, 1981, but voluntarily dismissed that action on June 24, 1986.  Plaintiffs refiled the case in 1987 but the trial court held that plaintiffs could not recover damages for parental loss of society for the death of a stillborn fetus.  The appellate court reversed that ruling in 1990.  The supreme court affirmed in 1991.  Plaintiffs reinstated their case on June 26, 1992.  

On July 11, 1996, plaintiffs filed their first amended complaint against Ingalls Memorial Hospital and Dr. Sutkus.  Count I against Dr. Sutkus alleged, in the main, that the doctor’s failure to provide appropriate prenatal care, to correctly interpret the fetal monitor strip, and to perform a timely C-section proximately caused the baby’s 
in
 
utero
 death.  Count II against Ingalls Memorial Hospital alleged that the hospital employees’ failure to accurately interpret the fetal monitor strip, failure to run the strip at three centimeters per minute, failure to record accurate data regarding the fetus’ distress, failure to recognize abnormal labor, failure to intervene appropriately by turning Mrs. Seef on her side and giving her oxygen and administering IVs, and failure to respond appropriately to signs of fetal distress and abnormal labor by notifying Dr. Sutkus and/or another appropriate medical person proximately caused the baby’s 
in utero
 death.

On March 4, 1998, 
Ingalls Memorial Hospital filed a motion 
in limine
 to bar all testimony from plaintiffs’ nursing expert, nurse Sharon Hall, and obstetrical expert, Dr. Max Lilling, 
that the hospital’s nurses deviated from the standard of care by failing to notify Dr. Sutkus earlier of changes on the fetal monitor strips.  Nurse Hall was to testify that, based on her interpretation of the data on the monitor strips, the nurses should have notified Dr. Sutkus by 1:25 a.m.  
Nurse Hall was also to testify that, if Dr. Sutkus had not seemed properly concerned when notified earlier, the nurses should have contacted their supervisor and explained their concerns, and that the nurses should have run the external fetal monitor at three centimeters per minute for a patient in labor.  Nurse Hall stated that a physician could order that the monitor be run at one centimeter per minute but that, if the nurses needed a clearer picture, they could go to three centimeters per minute on their own.  Because she was not a medical expert, nurse Hall could not provide an opinion as to whether the alleged deviations from the standard of care proximately caused the baby’s death.  

Dr. Lilling was to testify that, based on his interpretation of the fetal monitor strips, the nurses should have contacted Dr. Sutkus by 1:45 a.m.  Dr. Lilling did not find that running the external fetal monitor at one centimeter per minute was a deviation from the 
standard of care and stated that the nurses had not failed to operate the monitor properly.    

The hospital argued that testimony “regarding deviations for failure to notify earlier must be barred because it did not proximately cause the claimed injury of stillbirth.”  The trial judge agreed and barred such testimony because Dr. Sutkus had testified that, even if the nurses had notified him earlier, he would not have acted sooner.  The court, in fact, barred nurse Hall from testifying at all.  The court found her testimony regarding the need to call a supervisor was too speculative and too far removed from what plaintiffs had disclosed in their answers to interrogatories, and that nurse Hall was unable to provide proximate causation testimony connecting the running speed of the monitor and the baby’s death. 

Since Hall was plaintiffs’ only expert witness regarding deviations by the nurses, on the trial court’s suggestion, the hospital made an oral motion to dismiss based on lack of proximate cause.  The trial court granted the motion to dismiss on March 5, 1998.  At the trial court’s request, Ingalls Memorial Hospital then made a written motion to dismiss.  At a March 9, 1998, hearing, the trial court reiterated that it was dismissing the hospital and denied plaintiffs’ motion to reconsider, filed as a “motion in opposition to defendant’s motion to dismiss.”  The trial court refused the hospital’s request 
for a Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) finding that there was no just cause to delay enforcement or appeal of the dismissal order.  The court entered an order dismissing Ingalls Memorial Hospital with prejudice.  The order also stated that language as to finality and appealability would be entered at the time judgment was entered in the trial against Dr. Sutkus.

On March 10, 1998, the day before trial, plaintiffs filed a motion to bar the March 8, 1998, video evidence deposition testimony of Dr. Richard Depp for failure to disclose opinions pursuant to Supreme Court Rule 213 (166 Ill. 2d R. 213).  Plaintiffs asserted that Dr. Sutkus did not disclose Dr. Depp as an expert witness until after a court-

imposed December 18, 1996, discovery deadline had passed.  The court denied the motion.  Before the deadline, on April 3, 1996, counsel for Dr. Sutkus had sent a letter to plaintiffs’ counsel stating that “as previously indicated,” they had named Dr.  Depp as their expert in the case, that Dr. Depp’s opinions had been set forth in a 1985 discovery deposition conducted by plaintiffs’ previous counsel in the original 1981 action, and that all opinions set forth in the original case were readopted.  On February 20, 1997, counsel for Dr. Sutkus had sent a letter to plaintiffs’ counsel reminding them that plaintiffs’ counsel had continued a deposition of Dr. Depp and had not rescheduled it and that Dr. Sutkus’s counsel had yet to receive plaintiffs’ Rule 213(f) and Rule 213(g) interrogatories.  On August 13, 1997, counsel for Dr. Sutkus had sent a letter to plaintiffs’ counsel offering Dr. Depp for deposition again and outlining Dr. Depp’s opinions.  Although counsel for Dr. Sutkus offered Dr. Depp to plaintiffs for deposition several times, plaintiffs did not conduct a new discovery deposition.  

On March 11, 1998, the jury trial against Dr. Sutkus commenced.  Plaintiffs presented Dr. Lilling as their medical expert.  Dr. Sutkus presented Dr. Schulman, a pediatric infectious disease expert, and was to present the video evidence deposition of Dr. Depp.  During the evidence deposition, the parties had agreed to a standing Rule 213 objection: all Rule 213 objections were preserved for presentation to the trial judge.  Therefore, on March 11, the trial judge met with the parties and conducted a six-hour review of plaintiffs’ Rule 213 objections to the evidence deposition.  Following the in-chambers review, the video tape was recut to reflect the sustained objections prior to presentation to the jury.

On March 18, 1998, the jury returned a verdict in favor of Dr. Sutkus and the trial court entered judgment on the jury’s verdict.  The court also entered a separate order making the March 9, 1998, order dismissing Ingalls Memorial Hospital with prejudice final and appealable pursuant to Supreme Court Rule 304(a), as of March 18, 1998.  

On April 8, 1998, plaintiffs filed a notice of appeal from the order of March 9, 1998, granting dismissal in favor of Ingalls Memorial Hospital, and from the order of March 18, 1998, making the March 9, 1998, order final and appealable.
  On May 1, 1998, having been granted an extension of time in which to file, plaintiffs filed a posttrial motion against the judgment on the jury verdict seeking a new trial
.  The posttrial motion included extensive argument regarding Ingalls’ dismissal.  On June 30, 1998, after oral argument, the court denied the posttrial motion.  On July 10, 1998, plaintiffs filed a notice of appeal “from the jury verdict and judgment entered on the verdict on March 18, 1998 and from the order entered in the Circuit Court of Cook County on June 30, 1998, denying Plaintiff’s [
sic
] Post Trial Motion.”  The two appeals have been consolidated.

We address first the issue of this court’s jurisdiction over the appeal from the order dismissing Ingalls Memorial Hospital.  Citing Supreme Court Rule 303 (155 Ill. 2d R. 303), the hospital argues that, because plaintiffs filed a posttrial motion subsequent to the filing of its notice of appeal from the dismissal order of March 9, 1998, that initial appeal was premature and rendered a nullity.  We disagree.

The trial court entered judgment on the jury verdict on March 18, 1998, thereby disposing of the claims of the parties and making both the dismissal order of March 9, 1998, and the judgment on the jury verdict of March 18, 1998, final.  Although the dismissal order became appealable on March 18, 1998, the court made a Rule 304(a) finding of no just reason for delaying enforcement or appeal of the dismissal order.  Rule 304(a) (155 Ill. 2d R. 304(a)) concerns appeals from final judgments that do not dispose of an entire proceeding and was intended to permit “’an appeal to be taken before final disposition of the case where the court considers an immediate appeal appropriate.’”  
Elg v. Whittington
, 119 Ill. 2d 344, 353, 518 N.E.2d 1232, 1238 (1987), quoting 
Ariola v. Nigro
, 13 Ill. 2d 200, 203, 148 N.E.2d 787, 789 (1958).  Such is not the case here, where the court specifically intended that the two issues be kept together, and the Rule 304(a) finding was unnecessary.  
Poulos v. Litwin
, 193 Ill. App. 3d 35, 38, 549 N.E.2d 855, 857 (1989).  

Plaintiffs’ appeal from the dismissal order was not premature.  Rule 304(a) provides in part:

“If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both.  Such a finding may be made at the time of the entry of the judgment or thereafter on the court's own motion or on motion of any party.  
The time for filing a notice of appeal shall be as provided in Rule 303.  In computing the time provided in Rule 303 for filing the notice of appeal, the entry of the required finding shall be treated as the date of the entry of final judgment.
”  (Emphasis added.)  155 Ill. 2d R. 304(a).

The time for filing an appeal is stated in Supreme Court Rule 303 as follows:

“[t]he notice of appeal must be filed * * * within 30 days after the entry of the final judgment appealed from, or, if a timely post-trial motion directed against the judgment is filed, * * * within 30 days after the entry of the order disposing of the last pending post judgment motion.

(2) When a timely post-judgment motion has been filed by any party, whether in a jury case or a nonjury case, 
a notice of appeal filed before the entry of the order disposing of the last pending post-judgment motion shall have no effect and shall  be withdrawn by the party who filed it
, by moving for dismissal pursuant to Rule 309.  This is so whether the timely post-judgment motion was filed before or after the date on which the notice of appeal was filed.  
A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the post-judgment motion
, as is provided in subparagraph (a)(1) of this rule.”  (Emphasis added.)  155 Ill. 2d R. 303(a)(1), (a)(2).

Pursuant to Rule 303, plaintiffs had 30 days from March 18, 1998, in which to file a notice of appeal from the hospital’s dismissal order unless a posttrial motion directed against 
that order
 was filed.  155 Ill. 2d R. 303(a)(1).  In the instant case, plaintiffs did not file a posttrial motion 
against the dismissal order
; therefore the 30-day period for filing an appeal from the dismissal order was not tolled.  Plaintiffs properly filed their notice of appeal within the prescribed time on April 8, 1998.  That appeal was not rendered moot by the filing of plaintiffs’ posttrial motion against the second order in the case, the judgment on the jury verdict.  We note that the trial court lost jurisdiction over the dismissal of the hospital once the appeal had been filed (
People v. Bounds
, 182 Ill. 2d 1, 3, 694 N.E.2d 560, 561 (1998)); therefore, plaintiffs’ argument regarding the dismissal of the hospital in their posttrial motion against the jury verdict was surplusage.   

We next address plaintiffs’ contention that the trial court abused its discretion when it granted Ingalls Memorial Hospital’s motion 
in limine
 and barred nurse Hall from testifying as to deviations from the standard of care by the hospital’s nurses.  The admission of evidence is within the discretion of the trial court and the trial court’s ruling will not be reversed absent an abuse of that discretion. 
Gill v. Foster
, 157 Ill. 2d 304, 312-13, 626 N.E.2d 190, 194 (1993).  In a medical malpractice action, plaintiffs have the burden of proving: (1) the proper standard of care by which to measure a defendant’s conduct; (2) a negligent breach of the standard of care; and (3) that the resulting injury was proximately caused by the breach.  
Higgens v. House
, 288 Ill. App. 3d 543, 546, 680 N.E.2d 1089, 1092 (1997).  Plaintiffs must present expert testimony to establish these three elements.  
Higgens
, 288 Ill. App. 3d at 546, 680 N.E.2d at 1092.  Plaintiffs here failed to show that the nurses’ deviations from the standard of care proximately caused the baby’s death; therefore, the trial court could properly exclude testimony regarding those deviations.  
LaSalle National Trust v. Swedish Covenant Hospital
, 273 Ill. App. 3d 780, 792, 652 N.E.2d 1089, 1096-97 (1995). 

Plaintiffs here presented the testimony of nurse Hall and Dr. Lilling to prove three major deviations from the standard of care by the nurses: failure to notify Dr. Sutkus earlier, failure to run the monitor at three centimeters per minute, and failure to contact a supervisor if Dr. Sutkus appeared unconcerned.  After a hearing, the court found that, although there may have been deviations from the standard of care by the nurses, they were not the proximate cause of the baby’s death and barred the testimony.  
The court stated that, “ even though there may have been a deviation on all three from a nursing viewpoint, they were not a proximate caused [
sic
], at least two of them.  And the one on chain of command, it’s so speculative that you don’t have enough, in my opinion, opinion testimony to tie that in.”  We concur.  

Dr. Sutkus testified that he would have done nothing differently even had he seen the monitor strips earlier, thereby negating any argument for notifying him earlier.  
If
 the nurses had notified Dr. Sutkus earlier, his interpretation of those earlier monitor strips would not have indicated a problem requiring immediate intervention prior to 3:05 a.m.  Dr. Sutkus testified that the first sign of a problem was on the monitor strip starting at 3:05 a.m. and that the earlier monitor strips showed adequate fetal recovery.   

The dissent argues that Dr. Sutkus' "self-serving hypothetical" testimony that he would not have delivered the baby sooner had he seen the earlier monitor strips does not break the causal link between the nurses' deviations and the death of the baby.  We note initially that Dr. Sutkus' testimony was neither self-serving nor hypothetical.  Rather, Dr. Sutkus made an inculpatory, unequivocal statement regarding his mental state at the time of the incident.  He took full blame for the baby's death by admitting that, based upon the state of his knowledge at the time, he misapprehended the seriousness of the situation.  He admitted that, in hindsight, the baby should have been delivered sooner.  This evidence of what Dr. Sutkus would or would not have done cannot be negated by Dr. Lilling's testimony.  Dr. Lilling cannot testify regarding what Dr. Sutkus' mental state was nor contradict what Dr. Sutkus thought at the time. 

Further, Dr. Lilling's testimony that any reasonably qualified obstetrician would have delivered the baby sooner goes to Dr. Sutkus' liability, not to the nurses' or the hospital's.  Dr. Sutkus already admitted that, apparently contrary to what any other reasonably qualified obstetrician within Dr. Lilling's ken would have done, he would have done nothing differently if the nurses had notified him earlier to show him the monitor strips.  Assuming 
arguendo
 that the nurses had notified Dr. Sutkus several hours earlier, Dr. Sutkus admitted that he would have misinterpreted the data on the monitor strips in the same way.  Dr. Sutkus stated that, based on his interpretation of the earlier monitor strips, the situation was acceptable up until 3:05 a.m. and that there were no deviations sufficient to act upon.  By his own admission, the nurses' failure to notify Dr. Sutkus earlier made no difference in this case.

With regard to the running speed of the external fetal monitor, we note, as the trial court did, that both Dr. Lilling and nurse Hall saw problems on the same one-

centimeter-per-minute strips where Dr. Sutkus saw no problems.  The court found this “the best argument that there was no difference” between the one-centimeter-per-

minute and three-centimeters-per-minute speed.  Medical expert Dr. Lilling stated that running the strip at one centimeter per minute was not a deviation from the standard of care by the nurses.  Both types of strips would accurately reflect contractions and heart rate.  The problem was one of interpretation of the data, not the speed with which it was generated.  

We agree with the trial court that plaintiffs’ argument regarding the duty of the nurses to notify a supervisor is too speculative.   Nurse Hall could not state whether it would have been necessary to notify a supervisor in this case because Dr. Sutkus was never notified to start with.  Further, she could not provide a medical opinion as to what Dr. Sutkus should or would have done, could not provide an opinion as to what the supervisor would have done or whether another doctor would have had to be called, and could not have provided a medical opinion as to whether another doctor would have done anything differently than Dr. Sutkus did.  Dr. Lilling testified that if the C-

section had been performed by 2:15 a.m., the baby’s 
in utero
 death could have been prevented.  Plaintiffs argue that this testimony provides the proximate cause nexus with the nurses’ duty to notify a supervisor if Dr. Sutkus did not take action.  But, as discussed above, the “chain of command” testimony was too speculative 
and did not establish a standard of care in the first instance. 

Plaintiffs argue that the trial court erred when it dismissed plaintiffs’ case against Ingalls Memorial Hospital through an untimely motion for summary judgment.  We note first that the instant case does not involve summary judgment and plaintiffs’ arguments regarding summary judgment are misplaced.  The trial court explained its reasons for dismissing the hospital through a motion to bar as follows:

“[I]s this in essence of motion for summary within the 45 days rule or outside the 45 days rule?  Or is this a motion in limine to bar testimony because [of] the prejudicial effect it might have?  If it is the latter, it’s a motion to bar, and I’m agreeing that it is.

Perhaps I can keep the parties in or could have kept the parties in during voir dire.   Could have kept the parties in during plaintiff’s case in chief and then when nothing was presented because of my bar to nurse Hall as to an expert opinion as to a deviation of standard of care, that was a proximate cause of the injury, that I would knock the hospital out of the way of a motion for directed verdict on close of plaintiff’s case.

And that’s really what plaintiff is saying.  I think that could have kept him in during that period of time.  And meant that I would have kept them here during the voir dire period, which would have been seven peremptory challenges for each side, rather than five.  It would have meant I would have kept them here for the purpose of cross-examination of the plaintiff’s witnesses.  And for other reasons, when I could see no other expert witnesses were available to testify that had been named by the plaintiff to testify against the hospital, Ingalls Memorial Hospital.”

The advantage of a motion 
in limine
 is that it allows the exclusion of evidence outside the jury’s presence and the trial court can properly use a motion 
in limine
 to avoid prejudice to one or more parties.  
Chicago & Illinois Midland Ry. Co. v. Crystal Lake Industrial Park, Inc.
, 225 Ill. App. 3d 653, 659, 588 N.E.2d 337, 342 (1992).  As the trial court stated: “I found no evidence that -- credible evidence that the jury could determine approximate [
sic
] cause, not deviation from standard of care.  And I felt that that would be prejudicial to everybody about the deviation from the standard of care.”  

Assuming 
arguendo 
that the motion to dismiss was actually a motion for summary judgment, the trial court could properly consider it.  Pursuant to Rule 2.1(f) of the rules of the circuit court of Cook County, a motion for summary judgment must be filed at least 45 days before the trial date “except by prior leave of court and for good cause shown.”  Cook Co. Cir. Ct. R. 2.1(f) (eff. April 23, 1992).  As the above quotes from the court show, the court indicated it would give leave to file a motion for good cause shown.  Even if the order of dismissal was in violation of a local circuit court rule, “that fact is not ground for reversal where, as here, no injustice has been done to anyone.”  
Minarik v. Commonwealth Edison Co.
, 12 Ill. App. 2d 410, 412, 139 N.E.2d 854, 855 (1957).  

Regardless of whether this was a motion to dismiss or an untimely motion for summary judgment, there were no genuine issues of material fact for a jury to consider.
(footnote: 1)  As discussed above, plaintiffs had no expert testimony to prove that the nurses’ deviations from the standard of care proximately caused the baby’s death.  Proximate cause “is ordinarily a question of fact to be determined from all the attending circumstances, and it can only be a question of law when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them.”  
Merlo v. Public Service Co.
, 381 Ill. 300, 318, 45 N.E.2d 665, 675 (1942).  In 
Gill v. Foster
, relied on by the trial court, our supreme court affirmed summary judgment for the defendant hospital where a discharge nurse’s failure to notify a surgeon of the plaintiff’s complaints of chest pain was not the cause of plaintiff’s injury because the doctor already knew of the pain and thought it a normal byproduct of surgery.  The supreme court stated that “even assuming the nurse had breached a duty to inform the treating physician of the patient’s complaint, this breach did not proximately cause the delay in the correct diagnosis of the plaintiff’s condition.”  
Gill
, 157 Ill. 2d at 311, 626 N.E.2d at 193.  Similarly, our review of the record in the instant case shows that the nurses’ failure to notify Dr. Sutkus earlier did not cause the delay in performing the C-section.  Dr. Sutkus testified that he saw nothing on the monitoring strips that would have caused him to act any earlier than he did.  There was no question of fact to consider.

  Citing 
Haist v. Wu
, 235 Ill. App. 3d 799, 601 N.E.2d 927 (1992), plaintiffs assert that the question of whether one would have acted differently had they been informed of other facts raises a question of fact which is for the jury to decide and that the trial court erred when it determined as a matter of law that Dr. Sutkus would not have acted differently had he been notified of Mrs. Seef’s condition earlier.  We disagree.  In 
Haist
, the appellate court 
inferred that the plaintiff would have sought medical help for his wife sooner if the defendant doctor had communicated the results of an ultrasound which indicated that the plaintiff’s wife had an ectopic pregnancy rather than a miscarriage.  The court based this inference on the plaintiff’s statement that,
 depending on the results of the test, he and his wife might have sought another doctor closer to home.  
Haist v. Wu
, 235 Ill. App. 3d at 821, 601 N.E.2d at 941.  Unlike 
in 
Haist
 and similar “failure to inform” cases,  we need not infer what Dr. Sutkus may or may not have done had he been notified earlier.  Dr. Sutkus provided that answer himself: he would have done nothing differently.  

Holton v. Memorial Hospital
, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997), cited by plaintiffs as distinguishing 
Gill
, is inapposite to the case at bar.  
In 
Holton
, the nurses had neglected to document the plaintiff’s slowly progressing paralysis in her patient chart, thereby causing her doctors to assume that she had suffered a sudden paralysis.  Plaintiff was misdiagnosed and her treatment delayed.  The doctors testified that they would have undertaken a different course of treatment had they known that the paralysis was progressive rather than sudden.  Therefore, the court found that the evidence permitted “the inference that the [nurses’] negligent acts and omissions prevented [plaintiff’s] physicians from correctly diagnosing and treating her condition.”  
Holton
, 176 Ill. 2d at 110, 679 N.E.2d at 1209. 
 Holton
 distinguished 
Gill
 because, in 
Gill
, the nurse’s report to the doctor of plaintiff’s complaint would not have caused any further action by the doctor whereas in 
Holton
, it would have led to the correct diagnosis and treatment.  
Holton
, 176 Ill. 2d at 109, 679 N.E.2d at 1208.  That was not the case in 
Gill 
and it is not the case here
.
  Contrary to plaintiffs’ assertion, based on Dr. Sutkus’ testimony, it made no difference that he was not aware of Mrs. Seef’s condition until he returned to her room at 3:05 a.m.  

Plaintiffs also argue that, pursuant to 
Borowski v. Von Solbrig
, 60 Ill. 2d 418, 328 N.E.2d 301 (1975), they were only required to show that the nurses’ negligence more probably than not caused the baby’s death.  Although that is indeed the test in 
Borowski
, as discussed above, plaintiffs presented no question of fact for the jury to decide on the issue of proximate cause, regardless of the test to be used.

If we accepted plaintiffs’ argument that the motion to dismiss was an untimely motion for summary judgment and reversed the trial court, plaintiffs would ultimately find themselves in the same position they are in now.  With no expert testimony to prove causation, the court would grant a directed verdict for the hospital, after having had to waste both its and the parties’ time, money and energy on an unnecessary proceeding.  “[T]he law does not require the doing of a useless act.”  
Stone v. La Salle National Bank
, 118 Ill. App. 3d 39, 45, 454 N.E.2d 1060, 1065 (1983).   

Plaintiffs next argue that, even if 
Gill v. Foster
 is applicable here, the nurses’ deviations from the standard of care (absent earlier notification to Dr. Sutkus), establish a case whereby a jury reasonably could have found those deviations to be a proximate cause of the injuries sustained.  Although there may be more than one proximate cause of injury (
Merlo
, 381 Ill. at 317, 45 N.E.2d at 675), that is not the case here.  Plaintiffs did not provide the requisite proximate causation testimony to link the nurses’ deviations from the standard of care to the injury.  Nurse Hall could not testify regarding proximate cause since she was not a medical expert.  Plaintiffs’ medical expert, Dr. Lilling, did not provide the necessary proximate cause testimony because he did not find that the nurses were deficient in running the monitor at the faster speed, did not address the nurses purported deviations regarding the “chain of command” issue, and did not address the nurses’ care and treatment of Mrs. Seef.

Plaintiffs’ last argument on appeal is that the trial court abused its discretion by allowing defense expert Dr. Depp to testify with new opinions not previously disclosed pursuant to Supreme Court Rules 213(g) and (i).  Effective January 1, 1996, Rule 213 (166 Ill. 2d R. 213, now 177 Ill. 2d R. 213) replaced Supreme Court Rule 220 (134 Ill. 2d R. 220) in setting forth the disclosure requirements for opinion witnesses.  Rule 213(g) provides:  

“An opinion witness is a person who will offer any opinion testimony.  Upon written interrogatory, the party must state:

(i) the subject matter on which the opinion witness is expected to testify;

(ii) the conclusions and opinions of the opinion witness and the bases therefor; and

(iii) the qualifications of the opinion witness; 

and provide all reports of the opinion witness.”  177 Ill. 2d R. 213(g).

Rule 213(i) provides:

“A party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party.

If a deposition of an opinion witness is taken, the witness' testimony at trial will be limited to the opinion expressed therein, in addition to those opinions identified in answers to Rule 213(g) interrogatories.

The opinions expressed in a deposition need not be later specifically identified in Rule 213(g) answers but, upon objection at trial, 
the burden is on the proponent of the witness to prove the opinions were provided in deposition or Rule 213(g) interrogatory
.”  (Emphasis added.)  177 Ill. 2d R. 213 (i).

The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties.  
See
 Department of Transportation v. Crull
, 294 Ill. App. 3d 531, 690 N.E. 2d 143 (1998); 
Adami v. Belmonte
, 302 Ill. App. 3d 17, 704 N.E. 2d 708 (1998); 
McMath v. Katholi
, 304 Ill. App. 3d 369, 711 N.E.2d 1135 (1999).  The committee comments to Rule 213 explain that, “in order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule * * * and that no new or additional opinions will be allowed unless the interests of justice require otherwise.”  177 Ill. 2d R. 213 (g), Committee Comments.  Upon written interrogatory, a party 
must
 
disclose
 the subject matter, conclusions, opinions, qualifications and reports of any witnesses who will offer any opinion testimony and seasonably supplement any previous answers when additional information becomes known.  
Department of Transportation v. Crull
, 294 Ill. App. 3d at 536-37, 690 N.E. 2d at 146, citing 
Iser v. Copley Memorial Hospital
, 288 Ill. App. 3d 408, 411, 680 N.E.2d 747, 749 (1997).  

Upon each of plaintiffs’ objections to Dr. Depp’s opinions, Dr. Sutkus, as the proponent of the evidence, has the burden to prove that the opinions were provided in the discovery deposition or a Rule 213(g) interrogatory.  177 Ill. 2d R. 213(i); 
McMath v. Katholi
, 304 Ill. App. 3d at 381, 711 N.E.2d at 1143.  Any disagreement as to whether Dr. Depp’s opinions expressed in discovery and his opinions given in the evidence deposition are the same must be construed against Dr. Sutkus.  
McMath v. Katholi
, 304 Ill. App. 3d at 381, 711 N.E.2d at 1143.  Admission of evidence pursuant to Rule 213 is within the trial court’s discretion and the court’s ruling will not be reversed absent an abuse of discretion.  
Department of Transportation v. Crull
, 294 Ill. App. 3d at 537, 690 N.E.2d at 147.  

In the instant case, the able trial judge spent six hours in chambers with the parties, exhaustively reviewing plaintiffs’ numerous Rule 213 objections to Dr. Depp’s testimony.  For each objection raised, the court properly required counsel for Dr. Sutkus to explain where in the discovery materials the opinions had been disclosed, and the court sustained many of plaintiffs’ objections.  Where the court allowed testimony that had not been previously disclosed, it found that there was no prejudice to plaintiffs from the admission of the testimony or that the testimony was within the scope of the disclosed testimony.  Our examination of the record shows that the trial court appeared to be applying the erstwhile Rule 220 disclosure standards rather than the stricter Rule 213 requirements in its examination of the testimony.  As stated in 
Department of Transportation v. Crull
: 

“Rule 213 establishes more exacting standards regarding disclosure than did Supreme Court Rule  220 * * *, which formerly governed expert witnesses.  Trial courts should be more reluctant under Rule 213 than they were under former Rule 220(1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur.  Indeed, we believe one of the reasons for new Rule 213 was the need to require stricter adherence to disclosure requirements.”  
Department of Transportation v. Crull
, 294 Ill. App. 3d at 538-39, 690 N.E. 2d at 148. 

We have thoroughly reviewed the record and find that Dr. Depp’s evidence deposition contained testimony not previously disclosed pursuant to Rule 213.  

 Plaintiffs raised 25 objections on appeal but their reply brief reduced that number to 19 objections.  We note initially that plaintiffs’ objections 1, 8, 9, 14, and 17 were not raised in the trial court and are therefore waived.  
Stennis v. Rekkas
, 233 Ill. App. 3d 813, 826, 599 N.E.2d 1059, 1067 (1992).  Plaintiffs argue that, because they had an agreed standing Rule 213 objection during the evidence deposition, they did not waive any objections by not raising them in the trial court.  This is a nonsensical argument.  That stipulation referred to preserving objections so they could be raised before the trial court at a later time.  This is a court of review.  We cannot review the trial court’s decision on an objection if the trial court did not have the opportunity to hear that objection.

As to the remaining objections, plaintiffs’ objections 11, 12, and 13 were to disclosed testimony and thus properly overruled.   We note with regard to objection 11 (concerning testimony that the nurses did not need to notify Dr. Sutkus at any time earlier than 3:05 a.m.) that, although he did not state a precise time in his discovery deposition, Dr. Depp did testify that “there was no indication to call a physician” earlier.  Referring to a more precise time does not violate Rule 213.  

Plaintiffs’ objections 10 and 15 were not directed to opinion testimony but factual statements and thus properly overruled.  Plaintiffs’ objections 16 and 19 mischaracterize Dr. Depp’s testimony and are meritless.  Plaintiffs’ objection 18 was to testimony elicited by plaintiffs’ counsel during cross-examination of Dr. Depp.  Plaintiffs cannot now object to this testimony they elicited.

Plaintiffs’ objections 2, 3, 4, 5, 6, and 7 concern testimony that was not disclosed and was improperly presented to the jury.  Dr. Depps’ testimony at issue in objections 2 (macrosomia was not a condition that physicians diagnosed in 1980), 3 (ultrasound equipment in 1980 was inaccurate as much as 18% of the time), and 4 (diagnosis of cephalopelvic disproportion and that it cannot be ascertained until well into labor)  explained the bases for his disclosed opinion that Mrs. Seef had no prenatal risk factors.  As noted above, the 
bases
 for that opinion should have been disclosed.  177 Ill. 2d R.213(g); 
Firstar Bank v. Peirce
, 306 Ill. App. 3d 525, 714 N.E. 2d 116 (1999).  Although elaborating on a disclosed opinion does not automatically violate Rule 213
, the testimony at issue here cannot be considered to have been encompassed by the original opinion that “there was nothing prenatally to indicate Mrs. Seef had obstetric risk factors” and an “ultrasound, stress test or NST was not required.”  The cited testimony states new reasons for the opinion, rather than logical corollaries.  

Similarly, objection 7 concerns testimony (diagnosis of amnionitis would have been very difficult because Mrs. Seef might have had the flu, strep throat, or a sore throat) that was more than a mere elaboration on Dr. Depp’s opinion that the baby’s death due to infection was unforeseeable.  This basis for Dr. Depp’s opinion should have been disclosed and the testimony is therefore barred.  

The testimony at issue in objections 5 (labor was progressing slowly, offered in context of phases of labor as indicated by cervical dilation) and 6 (Mrs. Seef was merely experiencing preparatory contractions) concerns reasons why a C-section did not need to be performed earlier.  Neither of these bases for Dr. Depp’s opinion were disclosed in discovery.  Notwithstanding Dr. Sutkus’ assertions to the contrary, the discovery deposition, which focused mainly on interpretation of the fetal heart rate as shown on the monitoring strips, did not mention slow labor (cervical dilation) or prepatory contractions.  This opinion testimony should not have been allowed.

  We find the cumulative effect of the erroneous admission of Dr. Depp’s undisclosed opinions mandates reversal and remand to the trial court for a new trial.  We strongly urge practitioners that, if an opinion is important to the theory of one's case, it is essential that it and the bases therefor be disclosed.  This is a bright line rule and must be followed.    

For the reasons stated above, we affirm the dismissal of Ingalls Memorial Hospital and reverse and remand for a new trial with regard to Dr. Sutkus.

Affirmed in part and reversed in part; cause remanded. 

RAKOWSKI, J., concurs.

O'MARA FROSSARD, P.J., dissents.

Justice O'Mara Frossard, dissenting:

I agree with a remand for new trial, but would permit plaintiffs' case against Ingalls Memorial Hospital to proceed, as I believe the trial court abused its discretion by barring nurse Hall's expert testimony in its entirety and dismissing Ingalls.  A causal relationship between the defendant's negligence and the injury must be shown by a preponderance of the evidence.  
Chambers v. Rush-Presbyterian-St. Luke's Medical Center
, 155 Ill. App. 3d 458 (1987).  The plaintiff may provide either direct or circumstantial evidence to meet this burden and 
the weight to be given to evidence that the injury was proximately caused by the defendant's lack of skill or care is a matter left to the jury to decide.  
Bombagetti v. Amine
, 254 Ill. App. 3d 817, 821 (1993). 

Plaintiffs demonstrated sufficient evidence of a causal link between Ingalls' nurses' deviations from the standard of care and the death of the baby to raise a question of fact for the jury to resolve.  Nurse Hall's testimony established the nursing standard of care:  (1) Mrs. Seef be assigned high risk labor status upon her admission to the hospital; (2) Mrs. Seef's condition be assessed every 15 minutes; (3) the fetal monitoring strip be run at three centimeters per minute for ease of interpretation; and (4) Mrs. Seef be positioned on her side during labor.  Nurse Hall testified that the standard of care additionally required Ingalls' nurses to inform Dr. Sutkus of Mrs. Seef's status by 1 a.m. and that if Dr. Sutkus did not take appropriate action, the nurses were required to notify a nursing supervisor.  

Nurse Hall's testimony demonstrated Ingalls' nurses deviations from the standard of care.  Ingalls' nurses did not assign Mrs. Seef high risk labor status upon admission and they did not assess her condition with the frequency required.  Rather than setting the fetal monitoring strip at a speed of 3 centimeters per minute, Ingalls' nurses set it at one centimeter per minute, making the strip more difficult to read and interpret.  Nurse Hall testified that, as a result of the nurses' failure to set the monitor strip at the correct speed and their failure to properly monitor Mrs. Seef, changes on the strip were not identified and acted upon in the manner required by the nursing standards of care.  Those failures contributed to the baby's death.  

Sometime before 12:30 a.m., panels 94 and 95, on the fetal monitor strip, showed signs of hypertonic contractions.  Nurse Hall stated that once the monitoring strip revealed hypertonic contractions, Ingalls' nurses should have notified Dr. Sutkus, but they did not.  By 1 a.m. panel 99 indicated a loss of variability, a consistent pattern of extremely hypertonic contractions, another instance in which the attending nurses should have alerted Dr. Sutkus, although they failed to do so.  At 2:45 a.m., the monitor strip showed fetal heart arrhythmia.  Nurse Hall indicated that the nurses should have contacted Dr. Sutkus and if he failed to either give satisfactory orders or see Mrs. Seef himself, the nurses had an obligation to alert their nursing supervisor.  Again they failed to do so. 

The majority incorrectly concludes that Dr. Lilling did not provide the necessary proximate cause evidence.  Dr. Lilling, provided evidence that the nurses' failures contributed to the baby's death.  In his opinion the nurses failed to properly interpret Mrs. Seef's fetal monitoring strip.  Dr. Lilling noted that neither Dr. Sutkus nor Ingalls' nurses had the appropriate level of concern for Mrs. Seef's condition until 3:05 a.m., nearly an hour after the baby should have been delivered.  He offered evidence of a causal link between the nurses' failure to act and the baby's death when he indicated that with the proper level of care and concern the baby would have survived if delivered by 2:15 a.m., instead of at 3:45 a.m..  He stated that:  "[Mrs. Seef] needed a cesarean section anytime prior to 1:45[a.m.] to 2:45[a.m.] and the sooner it was done, the better off this baby would be."  Dr. Lilling's testimony that Dr. Sutkus should have delivered the baby between 1:45 a.m. and 2:45 a.m., combined with the nurses' failure to act during this time period, provided the necessary causal connection between the nurses' inaction and the baby's death.  
Bombagetti
, 254 Ill. App. 3d at 817.

Nurse Hall testified regarding the nurses' failure to position Mrs. Seef on her side during labor.  She noted that Mrs. Seef was turned from her right side to her back prior to 12:45 a.m. at panel 97 of the strip.  She further stated that: "Mrs. Seef was repositioned onto her back * * * and remained in that position until 3 a.m.  This position increases the likelihood of cord compression and was not a proper position for this mother to labor in."  Dr. Lilling's testimony paralleled nurse Hall's when he stated that Mrs. Seef's fetal monitoring strip displayed a "variable with a late component," indicating cord compression.  The cord compression resulted in hypoxic stress, or a lack of oxygen.  In Dr. Lilling's opinion the hypoxia progressed to anoxia, or a complete deprivation of oxygen, which caused the baby's death.  Dr. Lilling's opinion as to the cause of the baby's death coincided with Dr. Sutkus' opinion, where he indicated "anoxia" as the cause of death.  The nurses by repositioning Mrs. Seef on to her back increased the cord compression  resulting in oxygen deprivation which caused the baby's death.  

A defendant is liable for negligent conduct regardless of whether that conduct contributed in whole or in part to the injury.  
Chambers
, 155 Ill. App. 3d at 465.  A decision as to causation should be removed from the jury when not just the evidence, but also all the reasonable inferences therefrom, so overwhelmingly favor the defendant that no reasonable jury could find for the plaintiff.  
Bombagetti
, 254 Ill. App. 3d at 820.  
Although a reasonable jury could have found that the nurses' deviations from the standard of care contributed to the baby's death, the trial court erred by eliminating this possibility when it excluded nurse Hall’s testimony and subsequently dismissed Ingalls from the case.  Issues regarding standard of care and proximate cause are questions of fact properly to be decided by the jury.  
Aguilera v. Mount Sinai Hospital Medical Center
, 293 Ill. App. 3d 967, 972 (1997).  

Dr. Sutkus testified that even if he had known of Mrs. Seef's condition prior to 3:05 a.m., he would not have taken any different action.  Dr. Lilling, however, discredited Dr. Sutkus' assertion when he testified that any reasonably qualified obstetrician would have delivered the baby by cesarean section by 2:15 a.m. at the latest to save the baby's life.  Moreover, the nurses had a duty to notify him and to bring his inaction to the attention of their supervisor.  Dr. Sutkus speculated about what he would have done had the nurse acted in accordance with the standard of care, whereas Dr. Lilling offered not speculation, but an expert medical opinion as to how an obstetrician meeting the standards of care should have proceeded if properly notified.  
The weight to be given to Dr. Sutkus' and Dr. Lilling's conflicting testimony was a matter for the jury to determine.  
Suttle v. Lake Forest Hospital
, No. 1-97-3567 (September 30, 1999).  A trial court is not required to accept a defendant's hypothetical testimony as uncontroverted fact, particularly when the opposing party offers contradictory testimony.  See 
Wodziak v. Kash
, 278 Ill. App. 3d 901 (1996) (finding "scant evidentiary value" in a medical malpractice defendant's self-serving testimony, due to  bias). 

Ingalls' reliance upon 
Gill v. Foster
, 157 Ill. 2d 304 (1993), is misplaced.  In 
Gill
, our supreme court held that a nurse's failure to notify the treating physician of the plaintiff's chest pain did not proximately cause the injury, because the physician already knew of the plaintiff's chest pain.  
Gil
l
, 157 Ill. 2d at 310-11.  In 
Gill
, the doctor's notes supported the assertion of the defendant hospital that the doctor knew of plaintiff's symptoms and yet took no action.  Our supreme court noted that the treating physician had repeated contacts with the plaintiff after his complications arose and his condition worsened, yet the doctor still failed to properly diagnose the condition.  
Gill
, 157 Ill. 2d at 310-11.  The court therefore concluded that the nurse's failure to notify the physician could not have proximately caused the delay in plaintiff's treatment.  
Gill
, 157 Ill. 2d at 310-11.

In contrast, here, the nurses were the only medical staff in consistent contact with Mrs. Seef.  Dr. Sutkus monitored the fetal monitoring strip for a few minutes around 11:45 p.m. and then did not see Mrs. Seef again until three hours later at 3:05 a.m.  Unlike the physician in 
Gill
, Dr. Sutkus was not aware of Mrs. Seef's worsening condition.  
The only indication that the nurses' inaction did not contribute to the resulting death of this baby is Dr. Sutkus' untested assertion that had he been aware of Mrs. Seef's worsening condition he would not have done anything differently.  However, if upon notification Dr. Sutkus did not take the appropriate action, the proper standard of care required the nurses to notify a supervisor.  

The recent case of 
Suttle v. Lake Forest Hospital
, No. 1-97-3567 (September 30, 1999), is instructive.  In 
Suttle
, the plaintiff filed suit against the defendant hospital for damages allegedly caused by the hospital personnel's negligent care of her shortly after her birth.  The hospital's obstetrician observed that the plaintiff's mother had an abnormal placenta.  After delivering the plaintiff, the obstetrician sent the placenta to the pathology lab for testing, but did not inform any other hospital personnel of his observations.  As a result, when the plaintiff began to experience difficulty in breathing, the hospital pediatricians failed to diagnose her as suffering from hypovolemic shock and failed to properly treat her causing permanent neurological damage.  

The defendant hospital argued that the plaintiff could not establish proximate cause, because the pediatrician testified that his treatment of the plaintiff would not have differed even if he had been informed of the plaintiff's abnormal placenta.  The trial court agreed, and after a jury verdict in favor of the plaintiff, granted the defendant's motion for a judgment notwithstanding the verdict.   
Suttle
, slip op. at 6-7.  The trial court found that plaintiff could establish negligence on the part of the obstetrician, but based on the pediatrician’s testimony that he would have done nothing differently even if the obstetrician had informed him of the abnormal placenta, the court found the plaintiff could not provide the causal link between the obstetrician’s negligence  and the injuries.  
Suttle
, slip op. at 6-7.  This court reversed the judgment of the trial court, holding that "whether [the defendant's] treatment of [the plaintiff] would have remained the same had any of the hospital personnel informed him of [the plaintiff's mother's] condition was a question * * * for the jury to determine."  
Suttle
, slip op. at 13. 

Like the pediatrician in 
Suttle
, Dr. Sutkus testified his treatment would not have differed even if the  nurses had informed him of Mrs. Seef's worsening condition.  
The court in 
Suttle 
addressed the same issue and  noted that evidence which shows that negligent delay in diagnosis or treatment lessened the effectiveness of treatment is sufficient to establish proximate cause.  
Suttle
, slip op. at 13.  Here, any reasonably qualified obstetrician would have delivered the baby by 2:15 a.m. at the latest to save the baby's life.  Whether Dr. Sutkus' delay in delivering the baby and treating Mrs. Seef would have occurred had the nurses informed him of Mrs. Seef's worsening condition was a question of fact for the jury to determine.  
Suttle
, slip op. at 13.

I disagree that the testimony of Dr. Sutkus breaks the causal link between the nurses' deviations and the death of the Seefs' baby.  There is evidence that the nurses' deviations from the standard of care proximately  caused the baby's death by failure to assign high risk status, improper positioning, failure to provide oxygen and fluids, failure to notify a supervisor or other physician, and failure to properly run and interpret the fetal monitor.  Proximate cause issues are fact specific and uniquely for the jury's determination.  
Holton v. Memorial Hospital
, 176 Ill. 2d 95, 107.
  I would permit the plaintiffs to proceed against Ingalls and allow the jury to resolve these issues.  "To the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice * * *  proximately caused the increased risk of harm or lost chance of recovery."  
Holton
, 176 Ill. 2d at 119. 

FOOTNOTES
1:
We are aware of this court’s recent opinion in 
Suttle v. Lake Forest Hospital
, No. 1-97-3567, filed September 30, 1999, and find it unpersuasive.