Elna Adamsen, Appellant, v. August L. Magnelia, Appellee.

Gen. No. 9,072.

Opinion filed September 3, 1936.

SMITH & MENZIMER, of Rockford, for appellant;
LISLE W. MENZIMER, of counsel.

NORTH, GIBBONEY & NORTH, of Rockford, for appellee; FRANK P. NORTH, of counsel.

MR. JUSTICE WOLFE delivered the opinion of the court.

The defendant, August L. Magnelia, is a licensed physician practicing his profession in the city of Rockford, Illinois. On August 19, 1933, his office consisted of a suite of rooms in the Rockford National Bank Building. In the latter part of July, 1933, the plaintiff, Elna Adamsen, was in an automobile accident whereby she sustained a bruise on her cheek below the left eye. Shortly after the accident, a doctor lanced the wound and suggested electrical treatment for the injury. About August 16, 1933, she consulted the doctor concerning the injury, which at that time was a hard swelling. The defendant recommended electrical treatment, and on August 19, 1933, the plaintiff came to his office for such treatment. She was then about 28 years old and had been acquainted with the defendant for about three years. In the treatment, the defendant used an electro-therapeutic machine of standard manufacture, operated by electricity. The doctor fastened a metal plate on the left cheek of the plaintiff and a metal plate on her right cheek. These plates were attached to the machine by wires. The defendant turned on the electricity and after the machine had been in operation for about 25 to 30 minutes, the plates were removed. During the treatment, the plaintiff received an electric burn on her right cheek.

The plaintiff brought an action for malpractice against the defendant and a summary of the counts of the complaint is given in our former opinion. *Adamsen v. Magnelia,* 280 Ill. App. 418. The jury found the defendant not guilty and the plaintiff appealed.

The plaintiff tried and submitted her case on the theory that the defendant negligently failed to attend the plaintiff during the treatment, as charged in the complaint and that the plaintiff was in the exercise of due care for her safety during the time of treatment. The verdict of the jury is to the effect that the evidence does not sustain the plaintiff's case, which she had to prove by a preponderance of the evidence.

It is contended by counsel for the plaintiff that the judgment should be reversed and the case remanded for a new trial, because the verdict is contrary to the manifest weight of the evidence. She urges that from the facts and circumstances appearing in evidence, it was the duty of the defendant to either remain in attendance during the time the treatment was being given, or to have some competent person, there to properly attend her, since the defendant knew the conditions, and she alleges that the evidence clearly shows that the defendant did not exercise due and reasonable care in the performance of that duty. The question of the alleged negligence of the defendant was thus circumscribed to the determination by the jury, as to whether she was properly and reasonably attended by the defendant during the treatment.

The electro-therapeutic machine used by the defendant is operated by a high-frequency electric current. The amperage used, is regulated and fixed by the operator by a switch with the aid of an indicator, which registers the strength of the current. The diathermic treatment by an electro-therapeutic machine is in general use by physicians to treat such swellings referred to in the evidence in this case, as a hemorrhage of the muscles. The amount of current to be used, is usually determined by the reaction of the patient, the nature of the ailment and the area being treated. It is difficult to ascertain, other than by advice from the patient, whether the machine has too much or too little current

going through it. The apparatus is attached to the patient by means of metal plates, or electrodes, which are connected to the machine by wires. These metal plates are also known as poles. If a plate is not firmly fastened to the patient, sparking between the plate and the skin of the patient takes place. The patient usually feels at the time a burning sensation, and if the current is not turned off, an electric burn results. The testimony is to the effect that the burning sensation is a sharp, poignant pain. The use of too much electricity through the machine may also cause a burn, accompanied by such pain to the patient.

The defendant connected the machine to the face of the plaintiff by placing or fastening a small metal plate on the swelling and another small metal plate on the right cheek of the plaintiff, and then winding a gauze bandage around her head. A few minutes after the current of 150 milliamperes was turned on by the defendant, the plaintiff told him that she felt a prickling or tingling sensation on her right cheek under the metal plate, to which the defendant replied, "that is good for you," or words to that effect. The plate on the right cheek of the plaintiff became loose and the plaintiff so advised the defendant. The doctor replaced the plate under the gauze. The plaintiff again informed him about the prickling feeling under the plate on her right cheek. While the plates were so applied to the plaintiff, and about five minutes after he had turned on the current, the doctor left his office and did not return for about 30 minutes.

The defendant's suite of offices, so far as can be learned from the testimony, consisted of a reception room with a hallway entrance; two examination rooms and a private office between the two latter rooms. A door to each examination room opened into the private office, and to enter either of these rooms it was necessary to pass through the private office. There

was a desk in the private office and an examining table in the room where the electro-therapeutic machine was situated.

The testimony is in conflict whether the defendant left a nurse to attend the plaintiff during his absence. It is urged by the plaintiff that if the nurse was present, with or near the plaintiff during the treatment, she was not competent, under the conditions as shown by the evidence, to properly attend the plaintiff. The defendant also testified that the plaintiff told him that she felt a "tingling," instead of a "prickling," feeling. The testimony is also in conflict as to whether the defendant gave the plaintiff instructions that he should be told if she felt a burning sensation while the treatment was being given.

So far as the evidence is to be noted at this time, the plaintiff testified substantially as follows: Dr. Magnelia said nothing to me when he applied the plates. He went over to the little table next to the door, and about two minutes afterward I said, "Doctor, this is prickling, I feel a pin prickling sensation on my right cheek." I felt nothing where the injury was that was being treated. He just turned his head and said, "That's good for you." Just a few minutes later I said, "Doctor, this thing is falling down." The plate on my right cheek fell down to my shoulder, and the doctor came over to my side, and was putting it up under the gauze, and I told him, "There is a prickling," and he said, "I think that will stay there now." He did nothing further with reference to the plates. Then he left the room and closed the door as he went out. There was no one else there except myself and the doctor from the time I went in there until he left. When he left, no one came in. I was in the room by myself about 25 or 30 minutes. During all that time, I was lying on the table just the way I was when he left. About 25 or 30 minutes later, a girl came into the room.

She had on street clothes, and she said, "Well, I'll take this off now before I get into my uniform." She took it off and didn't say anything. I got up from the table and went over to pick my hat up from the chair, and I looked into the mirror, while I was putting my hat on, and I saw what had happened to my face. Dr. Magnelia turned on the electric current after the plates were applied to my face. He did not turn it off before he left, at any time. After he left, I noticed the same prickling sensation that I had told him about when he was there. That continued from the time he put the plate on until the plate was taken off. The prickling sensation was on my right cheek where the burn was. His office girl or nurse turned the machine off. I felt nothing, except a prickling sensation that I called attention to. I had no burning sensation and had no sensation after the bandage was removed and I got up to put my hat on. There was no feeling in my cheek when I got off the table.

The mother of the plaintiff testified in part as follows: "I first saw Dr. Magnelia at my daughter's house on August 28, 1933, I took the bandage off and looked at my daughter's face. I said to Dr. Magnelia that I could not understand how that could happen, only through carelessness, and Dr. Magnelia said he knew it, and couldn't tell me how sorry he was." This was the evidence of the plaintiff bearing on the material facts of the case.

The defendant, testified substantially as follows: I told her (plaintiff) if there was any indication of burning to let me know immediately, or if there was any indication of the electrodes moving, and I told her not to move her head, and keep as quiet as possible. After the machine was turned on about a half a minute she told me one of the electrodes had become loose. I turned the machine off and replaced the electrode. I don't think it had moved over half an inch. It was

not on her shoulder,. lying loose. I turned back the switch and turned on the power again, and told her if there was any burning to let me know. I told her to be quiet and I walked over to my private office, which is about four or five feet from the room in which Mrs. Adamsen was. My nurse, Margaret Swanson, was in my private office. The door was open between my private office and the room where Mrs. Adamsen was. I told my nurse that Mrs. Adamsen was on the table taking her treatment, and that I had advised her to tell us if any burning sensation was occurring. If so notified, I instructed the nurse to shut off the motor immediately. I gave her the time when the treatment was to cease, and when the machine was to be turned off. I remained in the room with Mrs. Adamsen while giving her the treatment four or five minutes. Mrs. Adamsen told me she felt heat, after the plate was readjusted. She said she felt a tingling sensation. I said, ''that is normal, that is the usual feeling that a person gets when under the apparatus.'' After the conversation with my nurse, I left the office and went to the end office, which is not in the suite I occupied. It belonged to Dr. Dubiel. When I left the office, the nurse was standing with her hand in the door leading into the room where Mrs. Adamsen was. I saw Mrs. Adamsen about half an hour afterwards in my private office. She had a burn on her right cheek. I did not have a conversation with Mrs. Adamsen's mother in which she said to me, ''I don't see how this thing could happen if the machine was put on tight; it must have been loose, otherwise it couldn't have happened, and it all happened through carelessness,'' and in which I said, ''I know it, and I can't tell you how bad I feel about it.'' I was admitted to the practice of medicine in this State in 1928. Before I came to Rockford, I had just finished my interneship at a hospital in St. Louis. I took the State board examination in Missouri, and have prac-

ticed continuously at Rockford since coming here. I never practiced medicine and surgery before I came to Rockford. I came to Rockford from my interneship. The machine was a 1933 model. I had had it about seven or eight months before this treatment was given. I never took a course in electrical engineering. My electrical training was in connection with medicine and medical treatment. I was in medical school four years. Mrs. Adamsen's head was resting on a pillow after the plates were applied. After she told me one plate was loose, I went over and adjusted the plate. I did not change the bandages. I did not add any more bandages. She did not say she experienced a prickling sensation. She said tingling. I remember the words distinctly. I told the nurse if Mrs. Adamsen complained of any burning or any feeling, that the machine should be shut off immediately, and, if not, within 15 minutes. I did not come back to my office before that time expired, nor get in touch with my office. I knew the current was turned on when I left.

Margaret Swanson, the nurse, testified as follows: I am married; my name in 1933, was Margaret Anderson. I am employed by Dr. Magnelia. I was in training at St. Anthony's Hospital for three years. It was a nurses' training course. I have been associated with Dr. Magnelia since 1932. I saw the plaintiff on the examining table while I was with a patient in another room. I had a talk with Dr. Magnelia in his office while Mrs. Adamsen was in the room. I was in the doorway between the office and the examining room when I had the conversation. The doctor said to leave her there for 15 minutes from there on and that if she had any complaint, to turn the heat off right away. I was familiar with the operation of the machine. It had been there six months or more. I knew where the switches were. For the next 15 minutes, after I talked to the doctor, I walked between her and the table, and the office,

or desk. She did not say anything during the time. I turned off the machine 15 minutes after the doctor spoke to me. The doctor left the room. I did not know where he went. I called the doctor on the telephone where I thought he was, but did not get him, so I started to look for him down the hall. After I turned off the machine, I took off the appliances. During the fifteen minutes after the doctor spoke to me, I had been in to Mrs. Adamsen's room three or four times, back and forth. The door was not closed into her room. I wore my white uniform that day. The doctor did not tell me where he was going nor when he was coming back. I do not remember how much current was used and I have never turned the machine on. Mrs. Adamsen's husband came for her in about 30 minutes after the burn occurred. He did not ask me what had happened, and I did not say I did not know, that I was not in the room, or words to that effect.

In rebuttal, Evald Adamsen, husband of the plaintiff, testified that, when he went into the office of the defendant, he had a conversation with the nurse and asked her what happened to his wife, and the nurse said, "I do not know, I was not in the room." The plaintiff testified as follows: The door to Dr. Magnelia's office was closed. The door was not opened at any time, after Dr. Magnelia left, until his nurse came in, and took off the machine. I did not while I was in the examining room hear any conversation between the defendant and his nurse.

Three physicians and surgeons practicing in Rockford testified on behalf of the defendant. Dr. Erickson had been practicing for seven years. Dr. Quandt, for five years and Dr. Weld, for 25 years. In reply to a hypothetical question, based on the facts testified to by the defendant and the nurse, these doctors each testified that in their opinion, the treatment as administered by the defendant was the usual and customary dia-

thermic treatment used by physicians in good practice in Rockford and similar communities in the vicinity of Rockford.

The evidence is in conflict on the material facts upon which the plaintiff bases her cause of action. The evidence is not complicated and the issue of the case turns on the question of the credibility of the witnesses. It was for the jury to say which testimony should be given credence, under all the facts and circumstances appearing in the evidence, and whether the plaintiff had proved her case by a preponderance of the evidence. To overrule the verdict of the jury, this court must be of the opinion that the verdict is contrary to the manifest weight of the evidence. (*Masonic Fraternity Temple Ass'n v. Collins,* 110 Ill. App. 504.) Questions of fact fairly presented are deemed to have been settled by the verdict. (*Skinner v. Sullivan,* 127 Ill. App. 657; *Shearer v. Aurora, E. & C. R. Co.,* 200 Ill. App. 225.) The evidence, as above stated, is not complicated, and an analysis thereof is not necessary. The verdict, in our opinion, is not contrary to the manifest weight of the evidence.

The plaintiff introduced as an expert witness Dr. Wright and propounded to him a hypothetical question embodying the facts as testified to, by the plaintiff. The question concluded as follows: "Have you an opinion as to whether or not the physician (the defendant) exercised such care in that treatment as is ordinarily exercised by physicians and surgeons in good standing, in and about the City of Rockford, Illinois, in the same general practice, having regard for the condition of medical science at that time?" The question was objected to on the ground that it usurps the province of the jury and asks the ultimate question in this case. The trial judge then stated, "that an expert can give his personal opinion, but I do not think an expert may give an opinion on the very question which the

jury are going to be called upon to pass on.'' The court sustained the objection. It is contended by the plaintiff that the court erred in ruling on the objection to the question. The question as to whether the defendant exercised such care in the treatment as is ordinarily exercised by physicians and surgeons in good standing, in and about the city of Rockford, was the ultimate fact to be decided by the jury and the defendant had the right to the judgment of the jury as to the proper inferences to be drawn from all the facts in evidence. *Hoener v. Koch*, 84 Ill. 408; *Keefe v. Armour & Co.*, 258 Ill. 28. The objection to the question was properly sustained.

The plaintiff complains of instruction number four which was given at the request of the defendant. This instruction is as follows: ''And even though you believe from the evidence that the plaintiff was burned as a result of such treatment, still if you further believe from the evidence, that the defendant was not aware of the fact that the said machine, while in operation, was burning the plaintiff, that the only means the defendant had of knowing that the machine had burned the plaintiff's face was by being advised by the plaintiff, and that the plaintiff's face was burned, and if you further believe from the evidence that the defendant told plaintiff to tell him if she felt any pain or burning, and if you further believe from the evidence that plaintiff was guilty of negligence in failing to tell defendant of any pain or burning, and that the silence of plaintiff was the cause of her being burned and damaged, then the plaintiff cannot recover in this case.'' The plaintiff complains of this instruction on the ground that it singles out certain facts, which were disputed. The defendant replies to that objection by stating that all the instructions are not set out in the abstract and that the law is, that the court will not consider an objection to an instruction, unless all the instructions are abstracted

so that the court may see whether the instructions, as a series, were correct or not. An instruction which directs a verdict on facts recited in the instruction (probably not good practice) must state all the substantive and controlling facts of the case. And if it does not, no other instructions will cure the defect. We quote from *Pittsburg, C., C. & St. L. Ry. Co. v. Banfill,* 206 Ill. 553, 556: "They (the instructions) are argumentative, and seek to raise questions not proper to be submitted to the jury. They violate the rule often announced by this court, that instructions which attempt to specify what conduct on the part of a plaintiff is imprudent or negligent should be *refused,* those being questions of fact for the jury to determine from all the evidence. (*Illinois Central Railroad Co. v. Griffin,* 184 Ill. 9; *Chicago, Burlington and Quincy Railroad Co. v. Pollock,* 195 id. 156; *Chicago & Eastern Ill. R. R. Co. v. Huston,* 196 id. 480.) In the latter case we said that it is not proper for an instruction to tell the jury what acts or omissions constitute negligence, or that it was the duty of the deceased to have looked and listened," etc.

It was a controverted question whether anyone was present in the room, with the plaintiff during her treatment. Her evidence is positive that there was no one present. The doctor admits that he was not present. Mrs. Swanson testified that she was present part of the time. This instruction assumes that the defendant was present, so that the plaintiff could notify him of the burning. The evidence discloses that the plaintiff was placed in a reclining position, the apparatus applied, and she was directed to lie still, until the end of the treatment. The instruction also assumes that the plaintiff knew that her face was being burned, and the evidence is positive that the plaintiff did not realize that her face was being burned, until after the treatment was over. There is expert testimony that there would

be sharp pain from such a burn, but this was a contro-
verted question for the jury to decide. It is our con-
clusion that it was reversible error for the court to give
this instruction.

The judgment of the circuit court of Winnebago
county, is hereby reversed and the cause remanded.

*Reversed and the cause remanded.*