MILLIE KOTVAN, Plaintiff-Appellant, v. KENT A. KIRK *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—99—0046

Opinion filed March 30, 2001.

---

Jordan B. Rifis, of Law Offices of Jordan B. Rifis, P.C., of Chicago, for appellant.

Donohue, Brown, Mathewson & Smith, of Chicago (J. Kent Mathewson, Karen Kies DeGrand, and Virginia L. Beach, of counsel), for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff, Millie Kotvan, brought this action for medical negligence against defendants, Kent Kirk, an ophthalmologist, and Kirk Eye Center (KEC). Plaintiff alleged that Dr. Kirk failed to timely diagnose and treat an infection that plaintiff developed after cataract surgery. The jury returned a verdict in favor of the defendants. The trial court denied plaintiff's posttrial motion.

On appeal, plaintiff contends that: (1) the jury's verdict was against the manifest weight of the evidence; (2) the trial court erred by finding that the defense expert, Dr. Rubenstein, was qualified to testify regarding plaintiff's eye infection; (3) the trial court erred by barring testimony concerning plaintiff's blood tests as undisclosed opinions in violation of discovery Rule 213 (134 Ill. 2d R. 213); (4) certain evidentiary rulings misled the jury and prejudiced the plaintiff's case; and (5) the trial court abused its discretion by questioning the venire before it was impaneled.

## BACKGROUND

On May 11, 1993, around 8:30 a.m., Dr. Kirk performed cataract surgery on plaintiff's left eye, which involved the implantation of an intraocular lens. The surgery was performed at KEC. Before the operation, plaintiff signed a consent form explaining that cataract surgery may result in loss of vision, reduction of corneal clarity, infection and retinal detachment.

The following morning, May 12, 1993, around 8 a.m., Dr. Kirk saw plaintiff for her first postoperative examination. At this visit, plaintiff reported no pain, nausea or vomiting. Kirk examined plaintiff's eye with a slit lamp and checked her retina and blood vessels in the back of her eye. Plaintiff's visual acuity at that time measured 20/60, but her intraocular pressure (IOP) was 38, with 10 to 21 being the normal range. Kirk performed a paracentesis tap to lower the IOP. To do this, Kirk pressed a needle next to the cataract surgery incision on the cor-

nea, releasing fluid out of the eye. Plaintiff's IOP was subsequently reduced to four.

After the follow-up exam, plaintiff vomited in the waiting room as she waited for the KEC van to take her home. Her sister, Nicholina Cantalupo, was with her. Plaintiff told a KEC technician, Kathleen Ernst (now known as Kathleen Ernst Zver), that she felt fine and left with her sister. Plaintiff vomited again in the van on the way home. Plaintiff's sister, Nicholina, called KEC several times throughout the day to report plaintiff's condition.

According to Nicholina, she reported repeated nausea, vomiting, pinching and burning, eye pain and ultimately loss of vision by 3 p.m. Plaintiff's son, Donald Kotvan, also testified that he told a KEC employee that plaintiff was experiencing eye pain and had lost vision in her eye. On the other hand, KEC technician Ms. Ernst only documented, "Millie vomited again. No eye pain, slight pinching and burning" in plaintiff's chart. Nurse Mary McLeod also took several calls concerning plaintiff and testified that she did not recall receiving complaints of any eye pain or loss of vision. Both Ms. Ernst and nurse McLeod testified that they informed Dr. Kirk after each call.

A KEC employee allegedly instructed Nicholina to contact plaintiff's family physician, Dr. Popper, to reduce the vomiting. Dr. Richard Mattis, an associate of Dr. Popper, prescribed an anti-emetic over the phone to stop her vomiting. Plaintiff continued to vomit despite the medication so Dr. Mattis instructed Nicholina to take plaintiff to the emergency room. Nicholina informed KEC that she was taking plaintiff to Gottlieb Hospital. Nurse McLeod testified that Dr. Kirk stated that he wanted to speak to the emergency room physician when plaintiff arrived at the hospital, and she contacted the charge nurse at Gottlieb Hospital and informed them of Dr. Kirk's request.

Plaintiff checked into Gottlieb Hospital's emergency room at 4:40 p.m on May 12, 1993. Dr. Viglione saw plaintiff 10 minutes later and was aware that plaintiff had had eye surgery from a nurse's note in the chart. He examined plaintiff's left eye with a penlight and noted that it was red and the pupil was reactive. Dr. Viglione testified that neither plaintiff nor any of her family members told him that plaintiff could not see out of her left eye or that she had pain in that eye. Dr. Viglione diagnosed plaintiff with gastroenteritis and did not believe there was anything wrong with plaintiff's left eye. Dr. Viglione called Dr. Kirk around 5:10 p.m. and informed him of the results of his exam. Dr. Viglione then admitted plaintiff as an in-patient out of concern for her vomiting and possible dehydration. The next morning, on May 13 around 8 a.m., Dr. Kirk saw plaintiff in the hospital. At 8:30 a.m. Dr. Kirk examined plaintiff and noticed hypopyon, a layering

of white blood cells in the eye, and corneal haze. Dr. Kirk diagnosed infectious endophthalmitis (IE) in her left eye. Dr. Kirk contacted Dr. Kenneth Resnick, a retinal specialist, sometime between 8:45 to 9 a.m. Dr. Resnick arranged for plaintiff's surgery. Around 11 a.m. he ordered a cardiology consult. Plaintiff's EKG was interpreted at 11:18 a.m. and showed signs of a possible previous heart attack. Plaintiff could not be cleared for surgery without approval of a cardiologist or internist. Dr. Popper, plaintiff's family physician, consulted with Dr. Resnick about plaintiff's EKG around 12:45 p.m. As a result, plaintiff was cleared for surgery. At 2:25 p.m. Dr. Resnick ordered a chest X ray. A report interpreting the film was dictated around 3:24 p.m. The report indicated that plaintiff's heart was borderline in size, with no demonstrable active pulmonary infiltrates or congestive changes.

Dr. Resnick operated on plaintiff's left eye shortly after 5 p.m. Six days later, plaintiff was discharged. She was then treated on an out-patient basis by Dr. Resnick, Dr. Joel Sugar and Dr. John Fournier, but her sight could not be saved. Plaintiff's doctors agree that her left eye will probably have to be enucleated.

At trial, Dr. Kirk testified that he is a board-certified ophthalmologist who performs approximately 500 cataract surgeries per year. Dr. Kirk stated that pressure in the eye is commonly elevated after cataract surgery because one of the substances used during surgery, viscoelastic, may block the outflow channel of the eye, temporarily elevating the IOP. Dr. Kirk explained that it was unlikely that a paracentesis tap to relieve IOP would cause bacteria to enter the eye because the physician inserts no instruments into the eye. Dr. Kirk testified that after the paracentesis tap, he found plaintiff's wound to be structurally intact and sealed. Dr. Kirk also examined plaintiff's eye with an indirect ophthalmoscope and did not notice any blood cells in the anterior chamber of her eye, an early symptom of IE.

Dr. Kirk further testified that he was aware that plaintiff vomited in his waiting room but did not reexamine her because he believed it was related to the paracentesis or elevated IOP. He stated that vomiting can ensue after an elevated IOP. Although plaintiff continued to vomit throughout the day, Dr. Kirk did not reexamine her because there were no reports of eye problems and Dr. Kirk believed plaintiff's condition was gastronomic and not eye-related. He stated that this belief was further confirmed by the emergency physician, Dr. Viglione, who never told Dr. Kirk that plaintiff was experiencing vision loss or eye pain. When Dr. Kirk examined plaintiff the next morning at 8:30 a.m. and found hypopyon and corneal haze, he diagnosed plaintiff with IE and contacted Dr. Resnick between 8:45 a.m. and 9 a.m. to perform surgery. Dr. Kirk also testified that it was the admitting or operating physician's role to oversee plaintiff's preparation for surgery, not his.

Next, plaintiff called three opinion witnesses, Dr. Fagman (retained expert), Dr. Fournier (treating physician) and Dr. Sugar (treating physician). Dr. Fagman, a board-certified ophthalmologist, testified that Dr. Kirk performed the paracentesis tap in a nonsterile manner and did not adequately check the wound after the procedure to insure that it was sealed. As a result, Fagman opined that bacteria entered the eye when the paracentesis was performed. Dr. Fagman also opined that Dr. Kirk deviated from the standard of care by failing to reexamine plaintiff after the vomiting occurred. Dr. Fagman believed that the vomiting may have caused plaintiff's wound from the paracentesis to open, thereby increasing the risk of infection. Further, Dr. Fagman testified that the continuous vomiting throughout the day was a symptom of IE.

Dr. Fagman stated that Dr. Kirk did not comply with the standard of care by relying upon Dr. Viglione's report, because Dr. Viglione, a nonophthalmologist, lacked qualifications or expertise in examining the eye. Dr. Fagman also opined that Dr. Kirk was negligent because he failed to ensure that plaintiff's surgery proceeded earlier than 5 p.m. on May 13. Dr. Fagman did concede, however, that circumstances may have required Dr. Resnick to wait before proceeding with surgery, including plaintiff's abnormal EKG and plaintiff's consumption of breakfast.

Dr. Fournier, plaintiff's retinal surgeon, agreed with Dr. Fagman that the paracentesis procedure caused bacteria to enter and infect plaintiff's eye. Dr. Fournier opined that vomiting is a symptom of IE and that plaintiff's streptococcus pneumonia and IE could be diagnosed within 12 hours or less. Dr. Fournier believed that the bacterial infection due to the paracentesis should have been observed by 8 p.m. on May 12 and that Dr. Kirk's negligence in relying upon Dr. Viglione's failure to detect infection at that time caused plaintiff's eye injury.

Plaintiff's last expert, Dr. Sugar, a treating physician, stated that nausea and vomiting could be symptoms of IE. On cross-examination, Dr. Sugar conceded that nausea and vomiting are not necessarily symptoms of IE. He also believed that IE typically occurs within five days following cataract surgery.

Defendant called one opinion witness, Dr. Rubenstein. Dr. Rubenstein, a board-certified ophthalmologist, served as the chairman of the ophthalmology department at Rush Northshore, director of the refractive surgery service at Rush-Presbyterian-St. Luke's Medical Center (Rush), and president elect of the Chicago Ophthalmological Society. He was a teacher of cataract surgery and management. He had knowledge of a study conducted to evaluate signs and symptoms of endoph-

thalmitis. Dr. Rubenstein testified that patients with plaintiff's strain of IE, streptococcus pneumonia endophthalmitis, have a very poor prognosis. He stated that neither his personal experience nor review of medical literature ever revealed an endophthalmitis diagnosis within 12 hours of a noninvasive procedure. He testified that symptoms of IE normally appear three to five days after a procedure.

Dr. Rubenstein also believed that plaintiff's IOP of four was sufficient to maintain outward pressure on the self-sealing wound after paracentesis. In Dr. Rubenstein's opinion, the signs and symptoms of IE do not include nausea, vomiting or diarrhea, though increased IOP can cause vomiting in a patient. He also opined that once bacteria enters the eye and causes infection, normally three to five days elapse before hypopyon, layering of white blood cells and first sign of IE, will be visible in the eye. Once hypopyon begins to occur, Dr. Rubenstein indicated that it can develop within hours. Accordingly, the hypopyon Dr. Kirk noted at 8:30 a.m. on May 13 may not have been visible an hour earlier at 7:30 a.m. In Dr. Rubenstein's opinion, even though Dr. Kirk found hypopyn on May 13, this symptom may not have been present on the evening of May 12.

Dr. Rubenstein further testified that medical clearance would be required to put a 77-year-old woman, like the plaintiff, under general anesthesia. Additionally, plaintiff's abnormal EKG would need to be evaluated before proceeding to surgery. Based on his review of plaintiff's medical records and a reasonable degree of medical certainty, Dr. Rubenstein testified that Dr. Kirk did not deviate from the standard of care in the timeliness of diagnosis or the treatment of plaintiff's IE.

The parties stipulated to Dr. Resnick's evidence deposition. Dr. Resnick was the surgeon who performed the vitrectomy procedure on plaintiff's eye on May 13. He was a board-certified ophthalmologist who specialized in retinal and vitreous surgery. Dr. Resnick testified that it was unlikely that infection was caused by the paracentesis tap because, during the procedure, material is flowing out of the eye and the risk that bacteria would be introduced inside the eye is minimal. In Dr. Resnick's opinion, it was more likely that the bacteria was introduced at the time of surgery because IE takes time to progress before any symptoms become apparent. IE is a known complication of cataract surgery and may occur in the absence of professional negligence. Dr. Resnick opined that even if bacteria was introduced during paracentesis, IE would not have been diagnosable as early as the afternoon or evening of May 12. Dr. Resnick explained that even in the most virulent strain of IE, streptococcus pneumonia which infected plaintiff's eye, symptoms could appear as early as 24 hours after infection, but not within two hours after bacteria enters the eye.

Dr. Resnick also indicated that the four major symptoms of IE are: eye pain, loss of vision or blurry vision, eye redness and mattering or discharge from the eye. Dr. Resnick stated that nausea is not a typical sign of IE. Nothing in the Gottlieb Hospital records indicated that plaintiff was suffering from IE when she presented at the hospital, and Dr. Resnick believed that Dr. Kirk did not deviate from the standard of care in terms of timeliness of diagnosis or treatment. Dr. Resnick further testified that the delay before surgery was not unusual due to the preoperative workup and transfer of necessary instruments from another hospital.

After trial, the jury returned a verdict in favor of the defendants, Dr. Kirk and KEC. Plaintiff appeals. We affirm.

## ANALYSIS

### I. MANIFEST WEIGHT

Plaintiff initially argues that the defendants' evidence concerning breach of duty was so insufficient that she should be entitled to a judgment notwithstanding the verdict or, alternatively, a new trial.

A jury's verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the jury's findings are unreasonable, arbitrary and not based upon any of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992). A judgment notwithstanding the verdict should be entered only if all of the evidence, viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). It is an abuse of discretion to grant a new trial when there is sufficient evidence to support the jury's verdict. *Krawczyk v. Polinski*, 267 Ill. App. 3d 258, 265, 642 N.E.2d 185 (1994).

In a medical malpractice case, the plaintiff must establish the standards of care against which the physician's conduct is measured by the use of expert testimony. *Knight v. Haydary*, 223 Ill. App. 3d 564, 569, 585 N.E.2d 243 (1992). In light of these standards, plaintiff must then prove that the doctor was negligent and his lack of skill or care caused plaintiff's injury. *Knight*, 223 Ill. App. 3d at 569-70. Whether the doctor deviated from the standard of care is a question of fact for the jury. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423, 328 N.E.2d 301 (1975). Additionally, the question as to what evidence to reject and what evidence to believe is a decision for the trier of fact, whose determination will not be upset on review unless it is manifestly erroneous. *Hall v. Northwestern University Medical Clinics*, 152 Ill. App. 3d 716, 725, 504 N.E.2d 781 (1987).

Plaintiff contends that evidence overwhelmingly showed that

Dr. Kirk and KEC deviated from the standard of care in several respects. First, plaintiff argues that Dr. Kirk failed to timely recognize and diagnose plaintiff's symptoms of IE. The experts in this case concurred that symptoms of IE include: (1) eye pain; (2) blurry vision or loss of vision; (3) redness of the eye; and (4) pus or discharge from the eye. Testimony conflicted as to whether nausea and vomiting were direct symptoms of IE. Plaintiff claims that Dr. Kirk should have reexamined plaintiff because she vomited after the paracentesis procedure. Dr. Rubenstein testified, however, that the signs and symptoms of IE do not include nausea, vomiting or diarrhea, although increased intraocular pressure could cause vomiting in a patient. Dr. Resnick also testified that nausea is not a typical symptom of IE.

Plaintiff also argues that Dr. Kirk failed to timely diagnose IE on May 12, when plaintiff presented in the emergency room. At this point, it is undisputed that plaintiff's symptoms included vomiting, redness of the eye, and "[n]o pain, slight pinching and burning" of the eye recorded earlier by KEC technician Ms. Ernst. There is conflicting testimony as to whether plaintiff reported the remaining symptoms: eye pain, vision loss or lack of visual acuity, and pus. In fact, Dr. Viglione testified that neither plaintiff nor her family members reported eye pain or vision loss when plaintiff presented in the emergency room. Dr. Kirk also testified that redness and pinching and burning are normal conditions after cataract surgery.

Plaintiff also contends that Dr. Resnick's opinion that Dr. Kirk did not breach the standard of care for failing to diagnose IE on May 12 was unsupported by reason and entitled to little weight. Plaintiff cites *Manion v. Brant Oil Co.*, 85 Ill. App. 2d 129, 229 N.E.2d 171 (1967). In *Manion*, the issue was whether decedent died due to natural causes or because of a car collision that occurred one year before. The court criticized Dr. Scott's opinion that death was caused by the collision because he cited no medical authority or experience to support his view. In fact, it was undisputed that the autopsy findings showed no condition of decedent that was caused by the collision. *Manion*, 85 Ill. App. 2d at 133-34.

*Manion* is distinguishable from the instant case. In *Manion*, the autopsy findings were undisputed. Here, however, there is conflicting testimony as to what symptoms plaintiff actually presented in the emergency room. No medical records indicate that she suffered from eye pain or vision loss. Dr. Resnick did opine that if plaintiff had complained of eye pain or vision loss, Dr. Kirk would have had a duty to investigate those symptoms. The resolution of conflicting testimony was required to determine whether plaintiff, in fact, exhibited symptoms that should have alerted Dr. Kirk to the possibility of IE on

May 12. The jury was in a better position to assess witness credibility, and we shall not disturb its findings on review. *Hall*, 152 Ill. App. 3d at 725.

Next, plaintiff contends that Dr. Kirk further deviated from the standard of care by failing to ensure that plaintiff was timely treated because she waited almost nine hours before Dr. Resnick performed the surgery. Defendant argues that it was the duty of the operating physician, not Dr. Kirk, to oversee preparation for surgery. Hospital records and Dr. Resnick's testimony indicated several reasons for the delay, including: plaintiff's abnormal EKG which had to be cleared for surgery by an internist or cardiologist, requirement of a chest X ray, and transport of surgical instruments ordered from another hospital. Dr. Resnick testified that he had canceled his patients for the day due to plaintiff's case. He stated that it is impossible to operate on a patient instantly and that he operated on plaintiff "as fast as humanly possible." Dr. Resnick also testified that he could not have saved plaintiff's eye even if he had performed surgery at 9 a.m. In our view, there was sufficient evidence for the jury to conclude that Dr. Kirk did not breach the standard of care concerning the timeliness of plaintiff's surgery.

Finally, plaintiff relies on *Adamsen v. Magnelia*, 286 Ill. App. 412, 3 N.E.2d 708 (1936), to argue that Dr. Kirk abandoned plaintiff on two occasions: (1) for 24 hours after the paracentesis tap; (2) and for 9 hours after the diagnosis of IE. In *Adamsen*, a physician left his patient for 30 minutes, while an electrical device was applied to her face and caused a burn. There was a factual dispute concerning what plaintiff reported to the doctor before he left the room. Plaintiff alleged a "pin prickling" sensation; whereas, the doctor said she described a "tingling" feeling. On review, the appellate court found that the case turned on the credibility of the witnesses, and it was for the jury to say which testimony should be given credence. The court concluded that the jury's verdict in favor of the doctor was not against the manifest weight of the evidence. *Adamsen*, 286 Ill. App. at 421.

Similarly, in the instant case, there is a factual dispute as to whether plaintiff reported severe eye pain and vision loss or only "[n]o pain, slight pinching and burning." Like *Adamsen*, this case turns on witness credibility, which is a decision for the trier of fact. *Hall*, 152 Ill. App. 3d at 725. We hold that defense experts testified concerning each deviation, and on review, it cannot be said that the verdict was contrary to the manifest weight of the evidence.

## II. DR. RUBENSTEIN'S QUALIFICATIONS

Next, plaintiff argues that the trial court erred by denying plaintiff's motion to bar the testimony of the defense expert, Dr.

Rubenstein. Plaintiff contends that Dr. Rubenstein failed to qualify as an expert on IE because he had minimal firsthand observations of IE patients and reviewed no standard authorities on the subject of IE.

■ In establishing an expert doctor's competency to testify, the proponent must show: (1) the physician is a licensed member of the school of medicine about which he is to testify; and (2) the physician is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community. *Senderak v. Mitchell*, 282 Ill. App. 3d 881, 884, 668 N.E.2d 1041 (1996). If these foundational requirements are met, the trial court then has discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care. *Senderak*, 282 Ill. App. 3d at 884.

■ In the instant case, Dr. Rubenstein was a board-certified ophthalmologist, satisfying the first foundational requirement. As for the second element, Dr. Rubenstein stated that he was familiar with IE, even though he acknowledged that he had only seen three cases since his practice began in 1986. The trial court considered plaintiff's objections to Dr. Rubenstein in the following colloquy:

"THE COURT: In any event, I think what we are arguing is not the admissibility, but the weight that should be accorded to the testimony of someone. I presume he is an ophthalmologist. I presume that the evidence will indicate a part of his training is to identify this disease process, the disease, and to understand the mechanism and the disease process that goes on.

As to the frequency with which he has treated or had cases of this kind of disease, that may be minimal, but that's not to say that we should bar him. ***

MR. RIFIS [plaintiff's counsel]: Well, what I suspect he will do is testify to it, but, then, on cross examination, it will be divulged that he doesn't have the experience that he is talking about.

THE COURT: I suppose there will be some questions do you have an opinion and what's the basis for the opinion. That seems to be the criticism that you registered no bases."

It is clear from the record that the trial court was affording plaintiff's counsel the opportunity to show, during cross-examination, that Dr. Rubenstein lacked a basis for his opinion. If it appeared that Dr. Rubenstein was unqualified to testify about IE, the court indicated that it would strike his testimony. However, during cross-examination of Dr. Rubenstein, plaintiff's counsel did not question Rubenstein's qualifications or his familiarity with IE.

Moreover, on direct exam, Dr. Rubenstein had explained the basis for his familiarity with IE:

"It's one of the dreaded complications of cataract surgery, so it's

something that we all learn about in our training and learn to think about it and recognize the symptoms of it. It's really, I think, part of being an anterior segment surgeon, to understand the complications that can go along with it.

In addition to that, I do regularly teach courses and give examples about cataract surgery and anterior segment surgery, and one of the things I think is very important in teaching about a surgical procedure is having the surgeon understand the potential complications of the procedure and know how to recognize and manage them if possible.

And, lastly, I have encountered that complication three times myself during my practice and have been able to firsthand have that no-so-pleasant experience in having to deal with it."

As part of his training, Dr. Rubenstein testified that he completed a fellowship in cornea surgery, advanced cataract surgery and refractive surgery at the University of Minnesota. He was also associate professor of ophthalmology at Rush. Although Dr. Rubenstein may have had minimal firsthand contact with IE, he testified that he was taught to recognize symptoms of IE during his training as an advanced cataract surgeon. We agree with the trial court's determination that Dr. Rubenstein's limited encounters with patients suffering from IE goes to the weight of his testimony, and not its admissibility. See *Senderak*, 282 Ill. App. 3d at 885 (the fact that physician had not performed procedure for several years goes to the weight of his testimony, not to its admissibility). Plaintiff had the opportunity to diminish that weight during cross-examination and chose not to do so. Accordingly, the trial court did not abuse its discretion in allowing Dr. Rubenstein's testimony.

## III. RULE 213

■ Plaintiff next contends that the trial court erred by barring undisclosed opinion testimony related to plaintiff's blood test results. Supreme Court Rule 213 requires that, upon written interrogatory, a party must disclose the subject matter, conclusions, opinions, qualifications and reports of any witnesses who will offer any opinion testimony prior to trial. 177 Ill. 2d. R. 213(g); *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 21, 724 N.E.2d 115 (1999). Courts have consistently limited an expert's testimony to comments within the scope of and consistent with the facts and opinions disclosed in discovery. *Parker v. Illinois Masonic Warren Barr Pavilion*, 299 Ill. App. 3d 495, 501, 710 N.E.2d 190 (1998). The trial court's discretion is broad and should not be disturbed absent a clear abuse of that discretion. *Parker*, 299 Ill. App. 3d at 501-02.

■ In the instant case, a laboratory report of plaintiff's blood

sample taken on May 12, 1993, indicated a high white blood count (WBC) and high granulocyte count. The lab report was disclosed to both sides during discovery. However, for the first time during trial, plaintiff attempted to elicit testimony from her experts, Dr. Fagman and Dr. Fournier, that the elevated WBC and granulocyte count indicated the presence of a bacterial infection, which is consistent with IE and inconsistent with gastroenteritis. Plaintiff argues that this testimony did not constitute a new opinion because Dr. Fagman and Dr. Fournier had previously testified that plaintiff had diagnosable IE based on symptoms known or knowable to defendants at the time plaintiff was at Gottlieb Hospital on May 12, 1993. We disagree.

*Seef* is instructive. In *Seef*, during discovery, plaintiff's expert Dr. Depp had disclosed his opinion that the decedent had no prenatal risk factors. Plaintiff argued that the following trial testimony by Dr. Depp merely explained the bases for his disclosed opinion that decedent had no prenatal risk factors: (1) macrosomia was not a condition that physicians diagnosed in 1980; (2) ultrasound equipment in 1980 was inaccurate as much as 18% of the time; and (3) diagnosis of cephalopelvic disproportion and that it cannot be ascertained until well into labor. The court disagreed. The court explained that although elaborating on a disclosed opinion does not automatically violate Rule 213, the testimony at issue was not encompassed by the original opinion that the decedent had no prenatal risk factors. Thus, the court held that the cited testimony stated new reasons for the opinion, rather than logical corollaries. *Seef*, 311 Ill. App. 3d at 23.

Similarly, in the instant case, testimony that plaintiff's blood test indicated a bacterial infection states new reasons for the opinion that plaintiff exhibited signs of IE on May 12. The basis for the opinion of Dr. Fagman and Dr. Fournier should have been disclosed and the trial court did not abuse its discretion by barring the testimony.

## IV. EVIDENTIARY RULINGS

### A. Cross-examination and Impeachment of Dr. Fagman

Plaintiff argues that three evidentiary rulings concerning the cross-examination and impeachment of her expert witness, Dr. Fagman, constituted reversible error. First, plaintiff argues that the cross-examination of Dr. Fagman was improper because Fagman was asked about a deposition statement allegedly made by Dr. Mattis that Mattis was not advised that plaintiff had a loss of vision or any eye problem. Plaintiff contends that Dr. Mattis' statement was hearsay and that the trial court erred by allowing the introduction of the discovery deposition statement into evidence.

The scope of cross-examination rests within the sound discre-

tion of the trial court and will not be disturbed on appeal absent abuse of that discretion. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 102, 658 N.E.2d 450 (1995). It is within the trial court's discretion to allow a hypothetical question, although the supporting evidence has not already been adduced, if interrogating counsel provides assurance that it will be produced and connected. *Leonardi*, 168 Ill. 2d at 96. If hearsay evidence is erroneously admitted, however, such error does not require reversal when the evidence does not materially affect the outcome of the case. *Presson v. Industrial Comm'n*, 200 Ill. App. 3d 876, 879-80, 558 N.E.2d 127 (1990).

■ In the instant case, the court allowed defense counsel to ask Dr. Fagman the following question over plaintiff's hearsay objection:

"Q. [Defense counsel:] I'm asking you about Dr. Mattis' testimony which you apparently haven't read. Would it be significant to you if Dr. Mattis testified that in neither one of the two phone calls he received was he advised that the patient had lost vision or that there was any problem with vision at all?

A. [Dr. Fagman:] It wouldn't make a difference to me because I don't think that they were talking to Dr. Mattis [about] her eye problem. They were talking to Dr. Mattis about her vomiting that was occurring since that morning."

The record indicates that Dr. Fagman had not reviewed Dr. Mattis' deposition. In our view, the court improperly allowed defense counsel to ask a hypothetical question concerning Dr. Mattis' deposition testimony without supporting evidence. However, the court's ruling was harmless error because it was not so prejudicial that it had a material effect on the outcome of the case. *Presson*, 200 Ill. App. 3d at 879-80.

■ Plaintiff also objected to the following question as a mischaracterization of Donald Kotvan's testimony:

"Q. [Defense counsel:] Would it be significant to you if taken in the context of Donald Kotvan testifying that he specifically told Dr. Mattis in the second conversation that [plaintiff] has now lost vision?

MR. RIFIS [Plaintiff's counsel]: Objection, your Honor. There was never any testimony to that anywhere.

THE COURT: Overruled. \*\*\* Again on redirect examination you may examine with respect to any conversation that seems to be at odds with your understanding.

\*\*\*

THE WITNESS [Dr. Fagman]: Would it be significant to me that Donald Kotvan—absolutely if he had reported it to Dr. Mattis.

Q. [Defense counsel:] Would Dr. Mattis' lack of any recollection of any reported vision loss be significant to your opinion?

A. No. It really would not. Because I don't know where Dr. Mattis was that afternoon, if he had a chart to record things in."

Donald testified that he had never contacted Dr. Mattis. Plaintiff asserts that the above colloquy casts doubt on Donald's testimony by implying that Donald lied about reporting vision loss to Dr. Mattis because Dr. Mattis had no recollection of such a report. The court indicated that plaintiff, on redirect examination, could question Dr. Fagman about "any conversation that seems to be at odds with your understanding." In our view, the court erred. However, it is also our view that the plaintiff was not prejudiced by the court's ruling. *Presson*, 200 Ill. App. 3d at 879-80. Finally, plaintiff argues that Dr. Fagman was improperly impeached with an opinion from his deposition. At trial, Dr. Fagman testified that he believed Dr. Kirk breached the duty of care after he referred plaintiff to Dr. Resnick by not ensuring that plaintiff received treatment earlier. In contrast, Dr. Fagman stated in his deposition that he had no opinion whether Dr. Kirk breached the standard of care after he referred plaintiff to Dr. Resnick, "unless [he became] aware of any other information that [he did not] have at the present time." This response was read to the jury, so the jury was aware that Dr. Fagman had qualified his response at the deposition.

■ It is appropriate to test the credibility of a witness by demonstrating that on a prior occasion the witness made statements inconsistent with his trial testimony. *Tarin v. Pellonari*, 253 Ill. App. 3d 542, 556, 625 N.E.2d 739 (1993). To be used for impeachment, a witness' prior statement must be materially inconsistent with his or her trial testimony. *Tarin*, 253 Ill. App. 3d at 557. The trial court has discretion to allow the admission of evidence for impeachment purposes, and a reviewing court will not disturb that decision absent an abuse of discretion. *Tarin*, 253 Ill. App. 3d at 557.

Here, we agree with the defendant that Dr. Fagman's response was inconsistent with his prior testimony on a material issue, breach of the standard of care. At trial, Dr. Fagman identified new information that he discovered after his deposition which caused him to change his opinion. Dr. Fagman explained that he researched a study that indicated the mean time for IE patients to receive treatment was approximately $2^1/2$ hours. In our view, the trial court did not abuse its discretion by allowing defendant to explore at trial what "other information" Dr. Fagman obtained that caused him to change his opinion.

## B. Duplicate Testimony

Plaintiff also argues that the trial court erred by limiting Dr. Fournier's testimony as cumulative. The trial court has discretion to limit the number of witnesses, and may bar an expert from testifying

if the expert's testimony would be cumulative. *Knight*, 223 Ill. App. 3d at 575, 577. It is an abuse of discretion if the trial court improperly excludes evidence so as to deprive a party of a fair trial. *Pyskaty v. Oyama*, 266 Ill. App. 3d 801, 814, 641 N.E.2d 552 (1994).

■ In the instant case, plaintiff argues that the trial court erred by refusing to allow Dr. Fournier to duplicate Dr. Fagman's testimony concerning deviations from the standard of care. Plaintiff further argues that the court unfairly allowed defendant's retained expert, Dr. Rubenstein, to duplicate Dr. Resnick's testimony regarding breach of the standard of care.

The record reveals, however, that plaintiff never represented to the trial court that she intended to call Dr. Fournier to testify about standard of care deviations. When defendant brought a motion *in limine* to bar Dr. Fournier's testimony as cumulative, plaintiff's counsel responded that he never intended to call Dr. Fournier to testify about standard of care; instead counsel stated that he only intended to call Fournier to testify about causation and damages. The trial court denied defendant's motion *in limine*. Thus, when the trial court later limited Dr. Fournier's trial testimony to causation and damages, it was merely following plaintiff's characterization of Dr. Fournier's intended testimony.

Furthermore, if plaintiff had in fact argued to the court to allow Dr. Fournier to testify about the standard of care during defendant's motion *in limine*, it is likely that the court would have permitted such testimony. The court made the following comment when plaintiff objected that Dr. Rubenstein's testimony duplicated Dr. Resnick's:

> "THE COURT: Gentlemen, personally, I have no problem with two witnesses of accepted credentials testifying on a point. Certainly, they may mimic one or the other, but, often times, it's been my experience that there are differences of shading in the testimony that's offered by these individuals. If you begin to put three logs on, four logs on, I think you run into a problem. But, so long as the accumulation, as it's so called, in objecting to it is of moderate form and indicates some shading of opinion different than the other colleague, I think it's permissible."

We also disagree with plaintiff that *Pyskaty* is analogous. In *Pyskaty*, the court held that it was reversible error to bar the testimony of plaintiff's treating physician concerning standard of care because it was cumulative. The court explained that the testimony was not cumulative because there was no other expert testimony on the issue of standard of care. *Pyskaty*, 266 Ill. App. 3d at 815. *Pyskaty* is distinguishable because, here, plaintiff's retained expert, Dr. Fagman, provided significant credible testimony on the issue of standard of

care. Thus, the trial court did not err by limiting Dr. Fournier's testimony to the issues of causation and damages when plaintiff had not indicated intent to question Dr. Fournier about standard of care.

## V. QUESTIONING VENIRE

█ Finally, plaintiff contends that the trial judge erred in conducting *voir dire* by eliminating potential jurors who expressed sympathy toward injured plaintiffs. Since plaintiff failed to make any objections during *voir dire*, plaintiff waived her right to appeal this issue. "Preservation of a question for review requires an appropriate objection in the court below [citation], and failure to object constitutes waiver." *Williamsburg Village Owners' Ass'n v. Lauder Associates*, 200 Ill. App. 3d 474, 479, 558 N.E.2d 208 (1990). Even were this issue not waived, our examination of the record discloses no error.

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

CAHILL, P.J., and GORDON, J., concur.