# Illinois Official Reports

## Appellate Court

***Morrisroe v. Pantano*, 2016 IL App (1st) 143605**

| | |
|---|---|
| Appellate Court Caption | WILLIAM A. MORRISROE, Special Administrator of the Estate of Viola Morrisroe, Deceased, Plaintiff-Appellant, v. JOHN E. PANTANO, M.D. and SUBURBAN LUNG ASSOCIATES, S.C., Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-3605 |
| Rule 23 order filed<br>Rule 23 order<br>withdrawn<br>Opinion filed | August 19, 2016<br><br>October 6, 2016<br>October 14, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-5639; the Hon. James P. McCarthy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael W. Rathsack, Stephan D. Blandin, and Michael E. Holden, all of Chicago, for appellant.<br><br>Scott L. Howie, Brian T. Henry, and Michael A. Barry, of Pretzel & Stouffer, Chtrd., of Chicago, for appellees. |

Panel                    PRESIDING JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Lampkin and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1       Following a jury trial, William Morrisroe (plaintiff), the special administrator of the estate of Viola Morrisroe (Viola), deceased, appeals the order of the circuit court of Cook County, entering judgment on the verdict in favor of Dr. John Pantano (Dr. Pantano) and Suburban Lung Associates, S.C. (collectively defendants). This medical malpractice action stems from the death of Viola after a bronchoscopy during which biopsies were performed by Dr. Pantano. On appeal, plaintiff asserts that the trial court erred in (1) barring his retained expert from utilizing two CT scans during his testimony to demonstrate that the size of a mass in Viola's lung had not increased in size and (2) sustaining defense counsel's objections to certain statements in closing argument relating to his informed consent claim. For the following reasons, we affirm.

¶ 2                              BACKGROUND

¶ 3       In 1999, Viola was diagnosed with chronic obstructive pulmonary disease (COPD) and emphysema by pulmonologist Dr. Edward Diamond (Dr. Diamond), the president of Suburban Lung Associates, S.C. Over the years that followed, Viola's condition was monitored by Dr. Diamond and, in 2006, she began obtaining routine CT scans. In February 2009, a CT scan (February scan) of Viola's lungs indicated a new mass had formed in the upper right lobe.[1] Dr. Diamond ordered further testing in the form of a PET scan. The PET scan indicated that, while unlikely, cancer could not be ruled out. Dr. Diamond discussed the results of the scans with Viola and recommended that another CT scan be performed in four months.

¶ 4       Subsequent examinations by Dr. Diamond in 2009 revealed that Viola's lung function was significantly decreasing. While Viola's lung function was at 40% in the beginning of the year, by the summer her lung function was only 26%, prompting Dr. Diamond to change her COPD from "severe" to "very severe."

¶ 5       On September 29, 2009, Viola was admitted to the emergency room for stomach pain and shortness of breath. A CT scan was taken of Viola's lungs (September scan). The following day, Viola was examined by Dr. Pantano. After reviewing and comparing the CT scans of her lungs from February and September 2009 (the scans), Dr. Pantano concluded the mass in the upper right lobe had increased in size. Dr. Pantano recommended that Viola have a bronchoscopy and biopsy. Dr. Pantano informed Viola of the risks associated with the procedure, namely the risk associated with the type of anesthesia used and that bleeding could occur. Viola was not informed of the risk of death.

¶ 6       On October 1, 2009, Dr. Pantano performed the bronchoscopy with Viola under conscious sedation. While taking a biopsy near the mass in question, bleeding occurred. Dr. Pantano took steps to remedy the bleeding and discontinued the bronchoscopy. Subsequent to the procedure,

---

[1]This "mass" is also referred to in the record as a "lesion," a "soft tissue density," and a "density." For clarity, we will refer to the area at issue as the "mass."

Viola's lung began to rebleed. As a result, she developed progressive respiratory failure and cardiac arrest, which lead to her death.

¶ 7 On March 12, 2010, plaintiff filed a medical malpractice complaint sounding in negligence against defendants.[2] Plaintiff alleged that defendants' deviation from the standard of care in performing the bronchoscopy caused Viola's death. Specifically, plaintiff alleged that the mass in Viola's lung had not changed in size, and therefore Dr. Pantano's decision to perform the bronchoscopy was unreasonable and deviated from the standard of care. The complaint further alleged claims based on defendants' failure to provide Viola with the proper informed consent, as she was not advised of the risk of death during the procedure.

¶ 8 Discovery

¶ 9 As part of discovery, defendants propounded interrogatories pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007), requiring plaintiff to disclose the expert witnesses he intended to call at trial, their opinions, and the bases for those opinions. Plaintiff's Rule 213(f)(3) disclosure indicated that his retained expert witness Dr. Charles Grodzin (Dr. Grodzin), a pulmonologist, would testify that in his opinion Dr. Pantano breached the standard of care when performing the bronchoscopy based on the following: (1) Viola had already undergone a full noninvasive evaluation of the abnormal mass, and it had been decided that the mass did not warrant any additional procedural evaluation; and (2) the September 2009 radiologist report noted that the mass was unchanged. The Rule 213(f)(3) disclosure did not contain any statements indicating Dr. Grodzin had measured the size of the mass as it appeared in the February and September scans.

¶ 10 In his discovery deposition, Dr. Grodzin indicated that his opinion that the mass had not changed in size was based on: (1) his review of the scans; (2) his measurements of the mass; and (3) the September 2009 radiologist's report. Regarding his measurements, Dr. Grodzin could not unequivocally state that he measured the mass and further testified that he could not recall what those measurements were. Dr. Grodzin did not state in either the Rule 213(f)(3) disclosures or during the discovery deposition that his opinion that the mass had not changed in size was based on lowering the screen contrast on the CT scans. Nor did Dr. Grodzin disclose that the screen contrast of the CT scans affected the appearance of the size of the mass.

¶ 11 Plaintiff's Case in Chief

¶ 12 At trial, plaintiff, Viola's husband, testified regarding his relationship with Viola and how he has been affected by her death. Plaintiff further testified that Viola suffered from COPD and required the use of oxygen from time to time. He further testified that Dr. Diamond, Viola's pulmonologist, indicated that Viola had a mass on her lung that he was monitoring and would take action when it grew in size, as it might be cancerous.

¶ 13 Viola's adult children—Michael Morrisroe (Michael), Julia Morrisroe (Julia), Eric Morrisroe (Eric), and Susan Lancaster (Susan)—testified regarding their relationship with Viola and how her death affected them. In addition, Julia, via videotaped deposition, testified that Viola suffered from COPD, asthma, and allergies. According to Julia, Viola smoked half a pack of cigarettes a day beginning in her early 20s, but had not smoked a cigarette for over 25

---

[2]Alexian Brothers Medical Center was originally named as a defendant, but is not a party to this appeal as summary judgment was previously entered in its favor.

years. Julia and Michael testified that they were aware Viola had a mass on her lung, and that her physician, Dr. Diamond, was monitoring her condition to determine whether the mass had grown in size. Susan testified that she took her mother to the hospital on September 29, 2009, because Viola did not generally feel well and was having issues with her stomach. According to Julia, medical testing indicated that Viola's blood oxygen was low, and Viola was admitted to the hospital. Eric testified that he visited Viola at the hospital on the day of the procedure. She was in a good mood, and was not worried or afraid of the procedure.

¶ 14    Plaintiff's retained expert, Dr. Grodzin, testified that Dr. Pantano deviated from the standard of care by proceeding with the bronchoscopy and performing the biopsies. Dr. Grodzin opined that the bronchoscopy was not warranted because the September scan demonstrated that the mass was "relatively stable, if not slightly smaller." Dr. Grodzin based his opinion on Viola's medical records, the September 2009 radiologist's report, and his review of the February and September scans.

¶ 15    Over defendants' objections that this testimony had not previously been disclosed, Dr. Grodzin testified regarding why the scans did not demonstrate an increase in the size of the mass. During this portion of his testimony, Dr. Grodzin utilized defendants' exhibit 20, which featured an image of the mass from the February scan on one side and an image of the mass from the September scan on the other.[3] According to Dr. Grodzin, the February and September scans did not have comparable images, as they were not taken at the same level in the chest. In addition, the February scan was performed without IV contrast (a dye that is injected in the patient's veins to highlight the vasculature), while the September scan utilized IV contrast. Further, the scans were performed by different machines, with the February scan taking images further apart than the September scan, meaning in the September scan had "much" greater detail. Accordingly, Dr. Grodzin opined that the February and September scans "are not really very comparable to draw conclusions from." Directly after this portion of Dr. Grodzin's testimony, defense counsel objected and a sidebar commenced.

¶ 16    During the sidebar, defense counsel argued that Dr. Grodzin's testimony regarding the screen contrast of the scans was not previously disclosed as a basis for his opinion that the mass had not changed in size. The court reviewed Dr. Grodzin's discovery deposition, and stated:

"THE COURT: I'm looking at line 13. This is where he talks about it and it changes, but you've been going into far different detail than this information that's on page[s] 78 and 79.

[Plaintiff's Counsel]: What he's saying on pages 78 and 79 is that there is no change between the February and September CTs.

THE COURT: Yes, but he's gone far beyond that. He's gone on to say one is with contrast, one is without. One is taken with a different type of density sensitivity.

[Plaintiff's Counsel]: Yes.

THE COURT: That he's also going through the different segments, and I don't see any of that disclosed.

---

[3]At the conclusion of the trial testimony, defendant's exhibit 20 was entered into evidence without any objection.

- 4 -

[Plaintiff's Counsel]: Yes, that is all true, Judge, because what he's doing is he's explaining the difference between the February film and the September film factually.

THE COURT: I disagree.

[Defense Counsel]: That would be the basis of his opinion.

THE COURT: Objection sustained."

¶ 17 In addition, Dr. Grodzin opined that "a reasonable and careful physician would have informed [Viola] of the risks of the procedure including the risk of dying," particularly in light of Viola's medical history.

¶ 18 On cross-examination, Dr. Grodzin did testify that the risk of death during a bronchoscopy is "probably" less than one percent. Dr. Grodzin further testified that if a patient presented a CT scan, which indicated a mass increased in size, it would be proper to perform a bronchoscopy. In addition, Dr. Grodzin testified that the PET scan Viola obtained in April 2009 did not definitively rule out that she had lung cancer, as a PET scan cannot detect cancer if the cancer is too small or of a certain type.

¶ 19 At the conclusion of Dr. Grodzin's testimony and outside the presence of the jury, plaintiff's counsel made a formal offer of proof. During the offer of proof, Dr. Grodzin referred to the February and September scans, which were displayed on a screen in the courtroom. Dr. Grodzin testified that he compared each scan, "slice by slice," and that formed the basis of his opinion that the mass had not changed. Dr. Grodzin testified that when the September scan was placed back to its original screen contrast setting, one can observe the vascular structures that are highlighted with IV contrast and that the mass in the upper right lobe is not actually a mass but is "just lung tissue that is not inflated." According to Dr. Grodzin, defendant's exhibit 20 was not a fair representation of how the mass appeared on both the February and September scans because (1) the scans were conducted differently, (2) the level at which the images are shown are different, and (3) the screen contrast "hides the fact you can identify the lung tissue on the September scan, and you can't really see it differentiated as it's shown [in defendant's exhibit 20]."

¶ 20                                                    Defendant's Case in Chief

¶ 21 Dr. Diamond, Viola's pulmonologist, testified as follows. He first diagnosed Viola with COPD and emphysema in 1999 based on her breathing functioning tests, history of smoking, and reports of shortness of breath, wheezing, and coughing. Over the years, Viola's COPD worsened; she had more episodes of shortness of breath, had more frequent hospitalizations, and required more medication and oxygen.

¶ 22 Upon examining Viola on January 27, 2009, Dr. Diamond ordered the February scan. The results of the February scan demonstrated that a new mass had developed in the right upper lobe of her lung. The radiologist suggested Dr. Diamond consider a bronchoscopy and biopsy. After reviewing the radiologist's report, Dr. Diamond ordered a PET scan. The results of the PET scan did not rule out cancer. On April 28, 2009, Dr. Diamond discussed the results of the PET scan with Viola and recommended that she obtain another CT scan in four months. Over the spring and summer, Viola's COPD worsened, going from "severe" to "very severe," as her physical condition was declining and she had only 26% lung function.

¶ 23 On September 29, 2009, Viola was hospitalized for shortness of breath and stomach pain. She was examined by Dr. Pantano, a member of Dr. Diamond's practice and the physician who

typically treated Viola when she was hospitalized. Another CT scan was taken of Viola's lungs. After reviewing the February and September scans, Dr. Pantano telephoned Dr. Diamond and stated the scans demonstrated the mass was larger and that Viola's physical condition was declining. Dr. Pantano recommended a bronchoscopy and biopsy be performed. Dr. Diamond agreed, mainly on the basis that her physical condition was deteriorating and, secondly, that the mass was enlarging. Dr. Diamond thought a bronchoscopy may be able to open up Viola's airways and relieve her shortness of breath, possibly prolonging her life. Dr. Diamond, however, did not review the September scan and relied on Dr. Pantano's interpretation of them. According to Dr. Diamond, a bronchoscopy was the only way to determine if an obstruction was causing a deterioration of her respiratory condition.

¶ 24        Dr. Pantano, a physician specializing in pulmonary and critical care medicine, testified that on September 30, 2009, he examined Viola at the hospital. He reviewed Viola's lab reports, which indicated she had no issues with clotting and further indicated Viola had low sodium levels. According to Dr. Pantano, low sodium levels can be associated with someone who has lung cancer. Upon reviewing all of images from the February and September scans and taking measurements of the mass in each of those scans, Dr. Pantano testified he had no doubt that the mass had enlarged. According to Dr. Pantano, the September 2009 radiologist's report did not describe any measurement taken of the mass and did not mention the mass. The report only referred to an atelectasis (an area of the lung which had collapsed) as being stable, which, according to Dr. Pantano, was not located in the same area of the lung as the mass. Dr. Pantano testified he believed a bronchoscopy was necessary because neither the February scan nor the PET scan could rule out cancer and the mass had increased in size. In addition, upon reviewing Viola's medical records, it was apparent that Viola's condition was worsening; she had a decline in her lung function, was on multiple medications, was using oxygen more frequently, and still had trouble breathing. Dr. Pantano considered the procedure to have a low risk with benefits that could improve her breathing and thus believed the benefits outweighed the risks at that time.

¶ 25        Dr. Pantano testified that he consulted with Dr. Diamond regarding whether a bronchoscopy should be performed on Viola. Dr. Pantano informed Dr. Diamond that the density in the upper right lobe had increased in size and, given the fact she was clinically worsening, recommended a bronchoscopy be performed. Dr. Diamond agreed with Dr. Pantano's assessment.

¶ 26        Dr. Pantano further testified that he discussed performing a bronchoscopy with Viola. Dr. Pantano informed Viola that the mass in her upper right lobe was enlarging, explained the procedure in detail, and discussed that the most likely complications would be over sedation from conscious sedation and bleeding during the biopsy. Dr. Pantano testified that he did not inform Viola that she could die from a bronchoscopy because the risk of death is so small, less than one percent. Dr. Pantano recommended the bronchoscopy because he "believed that there was a significant chance of improving her breathing if we found something in the airway that could be treated." Viola agreed to go forward with the bronchoscopy and signed the informed consent form, which had been prepared by the hospital.

¶ 27        Dr. Pantano testified that on October 1, 2009, he performed the bronchoscopy with Viola under conscious sedation, which is generally safer than deeper anesthesia because the patient is essentially still awake and breathing on his or her own. According to Dr. Pantano, the bronchoscopy revealed Viola had a blockage of the apical segment, which could have been

treated with a stent. Dr. Pantano then took biopsies from the upper right lobe and then two biopsies near the posterior segment of the mass. It was during these two posterior biopsies that bleeding occurred. Dr. Pantano stopped the bleeding and discontinued the bronchoscopy. Dr. Pantano testified he had no reason to believe that Viola would continue to bleed after the procedure was completed. Approximately two hours after the procedure ended, Viola began rebleeding, was intubated, and then transferred to the intensive care unit where she expired.

¶ 28   Dr. Michael Kaufman (Dr. Kaufman), a senior attending pathologist and director of autopsy services for NorthShore Hospital System, testified via videotaped evidence deposition regarding Viola's cause of death. According to Dr. Kaufman, Viola's cause of death was "multifactorial and included bilateral pneumothorax [collapse of both lungs], a hemorrhage of the right upper lobe[,] and severe bullous emphysema." Dr. Kaufman further testified that "[t]he hemorrhage in the right upper lobe and the bilateral pneumothorax were as a consequence from complications from the bronchoscopy procedure that was performed the day of Ms. Morrisroe's death." In addition, Dr. Kaufman testified that no tumors or cancerous lesions were discovered during the autopsy.

¶ 29   Dr. Patrick Fahey (Dr. Fahey), a physician specializing in internal medicine with a subspecialty in pulmonary disease, testified as an expert on behalf of defendants. Upon reviewing Viola's medical records and films, along with the depositions in this matter, Dr. Fahey opined that Dr. Pantano met the standard of care in ordering the bronchoscopy and responding to the bleeding that occurred during the biopsy. Dr. Fahey opined, to a degree of medical certainty, that it was reasonable to perform a bronchoscopy on Viola because there was "an enlarging density in the right lung in a patient who is at significant increased risk of having lung cancer." In addition, Dr. Fahey opined that the benefits of a bronchoscopy in this case outweighed the risks and that generally a bronchoscopy is a low risk procedure.

¶ 30   According to Dr. Fahey, Viola was suffering from a deteriorating clinical situation with recurrent exacerbations of her underlying lung disease, and that "the worry is that there is something potentially obstructing the bronchial tube that is increasing her recurrent exacerbations." Thus, Dr. Fahey further opined that the bronchoscopy would have been beneficial to Viola because it could have identified what was occurring in the right upper lobe and, if it had been a mucus plug, it could have been cleared out at the time of the bronchoscopy. Dr. Fahey explained that neither the scans nor the PET scan could rule out cancer in this case. Based upon his independent measurement of the mass as it appeared in the February and September scans, Dr. Fahey testified he agreed with Dr. Pantano's assessment that the mass increased in size. Accordingly, Dr. Fahey opined that, "The only reasonable way to determine what is going on in that right upper lobe is to perform a bronchoscopy, identify things, and potentially treat things that could be causing occlusion of the bronchus."

¶ 31                    Closing Argument and Posttrial Motions

¶ 32   In closing, plaintiff's counsel argued that Dr. Pantano failed to inform Viola of the possible risk of death from the procedure. In making this argument, plaintiff's counsel stated as follows:

"[Plaintiff's Counsel]: You think for one minute if they thought this was going to be a risky procedure, that there was a chance of death that they would have left her there by herself to die alone. This is an educated, smart, aggressive, organized woman. She would have made sure that she would have talked to her primary care physician, that she had told, she would have gotten a second opinion, she—

[Defense Counsel]: Your Honor, this is improper argument under the law.

THE COURT: Objection sustained.

[Plaintiff's Counsel]: Ladies and gentlemen, all of the steps and procedures that a reasonably careful person would do if they're told if there's a risk of death. She wasn't given the opportunity to do any of those things[.]

[Defense Counsel]: Again, object to the argument of informed consent.

THE COURT: Objection sustained.

[Plaintiff's Counsel]: In this case you have to decide what would this woman do. What would a reasonably, careful woman do under these circumstances.

[Defense Counsel]: Again, object to the reference to this woman.

THE COURT: Objection sustained.

* * *

[Plaintiff's Counsel]: Dr. Grodzin told you that a reasonably careful physician would advise a patient of the risk of death. Especially Viola Morrisroe with her prior history and her high risk.

Dr. Fahey disagreed. Dr. Fahey was going out after he testified here to perform a bronchoscopy and a biopsy. He wasn't going to tell that patient either. Don't you think that a patient would want to know that shaky hand Dr. Fahey that there was a risk of death associated with that procedure. Isn't that what a reasonably careful doctor would do. Especially this woman who had a fear of suffocating. Who had watched her own mother die a very difficult death.

[Defense Counsel]: Again this is improper argument.

THE COURT: Objection sustained."

¶ 33    Following closing argument, the jury rejected plaintiff's medical malpractice claims and returned a verdict in favor of defendants. Plaintiff filed a posttrial motion for entry of a judgment notwithstanding the verdict or, in the alternative, for a new trial. After the matter was fully briefed and argued, the trial court denied plaintiff's motions. This appeal followed.

¶ 34                                    ANALYSIS

¶ 35    Plaintiff first contends that the trial court erred in barring Dr. Grodzin from utilizing the two original scans to demonstrate that the size of the mass in Viola's lung had not changed. Plaintiff asserts Dr. Grodzin intended to demonstrate to the jury how the scans appeared when he reviewed them and how the mass appeared on the screen was dependent on the screen contrast level. Plaintiff maintains this information had been previously disclosed and that barring Dr. Grodzin's testimony in this regard was a substantial error, which might have tipped the scales in favor of defendants.

¶ 36    In response, defendants maintain that the trial court did not err in barring Dr. Grodzin's testimony regarding the screen contrast of the scans because that testimony was a new basis for Dr. Grodzin's opinion that the mass had not changed in size. According to defendants, this testimony was properly barred as it was not previously disclosed in plaintiff's Rule 213 disclosures or in Dr. Grodzin's discovery deposition.

¶ 37    The purpose of discovery rules, governing the timely disclosure of expert witnesses, their opinions, and the bases for those opinions, is to avoid surprise and to discourage strategic

gamesmanship amongst the parties. *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032 (2003). As a result, Rule 213(f)(3) states as follows:

> "A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

Rule 213(g) limits expert opinions at trial to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007); *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 98. Rule 213 disclosures are mandatory, and strict compliance is required. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). An expert witness may expand upon a disclosed opinion provided that the testimony states a logical corollary to the disclosed opinion and not a new basis for the opinion. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 37 (2010); *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46-47 (2005). That is to say, the witness' testimony must be encompassed by the original opinion. *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 860 (2002); *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 800 (2002).

¶ 38    "Faced with a challenge that testimony was not disclosed or exceeds the scope of Rule 213 disclosure, a trial court's ruling on the admission of evidence is an exercise of its discretion and will not be reversed absent an abuse of that discretion." *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 93. A trial court abuses its discretion when "no reasonable person would take the view of the trial court." *Id.*

¶ 39    We find *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7 (1999), a medical malpractice action regarding the wrongful death of a stillborn infant, to be instructive. In *Seef*, the reviewing court found several Rule 213 violations where the defendant's expert, Dr. Depp, testified about matters not previously disclosed during discovery. *Id.* at 23. Dr. Depp during discovery disclosed his opinion that the decedent had no prenatal risk factors. *Id.* At trial, the plaintiffs objected to Dr. Depp's testimony that: (1) macrosomia was not a condition which physicians diagnosed in 1980; (2) ultrasound equipment in 1980 was inaccurate as much as 18% of the time; and (3) the diagnosis of cephalopelvic disproportion cannot be ascertained until well into labor. *Id.* The trial court overruled plaintiffs' objections, finding that Dr. Depp's testimony explained the bases for his disclosed opinion that the decedent had no prenatal risk. *Id.* at 23-24. The reviewing court disagreed. *Id.* The *Seef* court explained that, although elaborating on a disclosed opinion does not automatically violate Rule 213, the testimony at issue was not encompassed by the original opinion that the decedent had no prenatal risk factors. *Id.* Thus, the court held that the cited testimony stated new reasons for the opinion, rather than logical corollaries. *Id.* In so finding, the *Seef* court noted, "We strongly urge practitioners that, if an opinion is important to the theory of one's case, it is essential that it and the bases therefor be disclosed. This is a bright line rule and must be followed." *Id.* at 24.

¶ 40    Similarly, in *Kotvan v. Kirk*, 321 Ill. App. 3d 733, 746 (2001), the reviewing court found the trial court did not abuse its discretion where the basis for the opinion of two expert witnesses was not previously disclosed. In that case, following cataract surgery and a paracentesis tap, the plaintiff began experiencing nausea, vomiting, and eye pain. *Id.* at 737. The plaintiff was examined by a doctor in the emergency room and diagnosed with

gastroenteritis. *Id.* The following day, the plaintiff's eye surgeon diagnosed her with infectious endophthalmitis (IE). *Id.* at 738. After surgery, the plaintiff's eye sight could not be saved. *Id.* At trial, the plaintiff's experts opined that bacteria had entered her eye during the paracentesis tap and that vomiting is a symptom of IE. *Id.* at 739. A jury ultimately returned a verdict in favor of the defendants. *Id.* at 741.

¶ 41 On appeal, the plaintiff argued that the trial court erred by barring undisclosed opinion testimony related to her blood test results. *Id.* at 745. A laboratory report of plaintiff's blood, which had been previously disclosed, indicated a high white blood cell count and a high granulocyte count. *Id.* at 745-46. The plaintiff argued that she should have been allowed to elicit testimony from her experts that the laboratory report indicated the presence of a bacterial infection, which is consistent with IE and not gastroenteritis. *Id.* at 746. The reviewing court found that the trial court did not abuse its discretion in barring the testimony as it stated a new reason, or basis, for the opinion that plaintiff exhibited signs of IE, and thus, should have been disclosed. *Id.*

¶ 42 In this case, Dr. Grodzin's proposed testimony, that by adjusting the contrast levels of the September scan one could view the mass more completely and observe that it consisted of vasculature and was not a tumor, cannot be considered to have been encompassed by his original opinion that the mass had not changed based on his review of the scans and measurements of the mass. Dr. Grodzin's offer of proof included a new basis as to why he believed the mass had not changed in size rather than a logical corollary to his original opinion. Therefore, the trial court did not err in barring this testimony. If Dr. Grodzin had developed such an opinion after submitting his Rule 213 disclosures and giving his deposition, he had a duty under Rule 213(i) to supplement his answers. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007). We find no evidence in the record that he ever requested to amend his answers. See *Steele*, 2013 IL App (3d) 110374, ¶ 99 (if an expert developed an opinion after submitting Rule 213 disclosures and giving a deposition, and it was prior to trial, the expert had a duty under Rule 213(i) to supplement his answers).

¶ 43 We further find plaintiff's reliance on *Spaetzel v. Dillon*, 393 Ill. App. 3d 806 (2009), to be misplaced. In *Spaetzel*, the plaintiffs asserted on appeal that the trial court abused its discretion when it allowed the defendants' expert witness to render opinion testimony as to his interpretation of certain radiography films in violation of Rule 213. *Id.* at 812. The plaintiffs argued that the Rule 213 disclosures were not sufficient to have put them on notice that defense counsel was going to display to the jury blow-ups of two CT scans and then elicit opinions regarding the defendants' expert witness' interpretations of those scans. *Id.* at 813. The record indicated that defendants' expert witness had previously disclosed that he would testify that the " 'air fluid identified postoperatively was not evidence of a recurrent paraesophageal hernia' " and that he had reviewed the CT scans as well as the diagnostic studies. *Id.* At trial, the defense expert witness testified that, based on his review of the films and the appearance of the various shadows and air fluid levels on those films, there "was insufficient evidence of a recurrent hernia during the postoperative treatment." *Id.* at 808-09. The reviewing court found that the particular opinions elicited from defendants' expert at trial were permissible as an elaboration on, or a logical corollary to, the originally revealed opinion. *Id.* at 813.

¶ 44 While the *Spaetzel* court found the expert witness' opinion testimony to be a logical corollary to an opinion that was already disclosed, in contrast, Dr. Grodzin's testimony set forth a new basis for his opinion that the mass had not changed in size. It is well established

- 10 -

that the failure to disclose a new basis for an opinion is improper. See *Seef*, 311 Ill. App. 3d at 23; *Kotvan*, 321 Ill. App. 3d at 746. Disclosure of a retained expert witness' opinions and the basis for that opinion "is a bright line rule and must be followed." *Seef*, 311 Ill. App. 3d at 24. Accordingly, we find the trial court did not abuse its discretion when it sustained defense counsel's objections and barred Dr. Grodzin from utilizing the scans to testify regarding the different contrast settings that could be applied when viewing the films.

¶ 45 Moreover, although plaintiff asserts it was "unfair" not to allow him to utilize the original scans during Dr. Grodzin's testimony, the record reflects that the trial court permitted plaintiff's counsel extensive leeway to question Dr. Grodzin regarding the discrepancies in defendants' exhibit 20. Over defendants' objections, Dr. Grodzin was allowed to testify that: (1) the February and September scans did not have comparable images; (2) the images on the scans were not done at the same level in the chest; (3) the February scan was taken without IV contrast, but the September scan was taken with IV contrast; (4) the scans were performed by different machines; and (5) the September scan had much greater detail. Although Dr. Grodzin was barred from testifying that the lower screen contrast was a basis for his opinion that the mass had not changed in size, we find plaintiff was allowed to present testimony to discredit defendants' exhibit 20, and therefore plaintiff was not deprived of the opportunity to challenge the exhibit and, in turn, the opinions of defendants' expert. See *Iser v. Copley Memorial Hospital*, 288 Ill. App. 3d 408, 413 (1997) (finding the trial court did not abuse its discretion when it did not allow plaintiffs' expert to testify to the authoritativeness of certain exhibits that were not properly disclosed).

¶ 46 Plaintiff next argues that the trial court erred in sustaining objections to his counsel's attempt to explain informed consent to the jury during closing argument. Plaintiff maintains that describing Viola's particular personality characteristics merely provided the attributes of a reasonable patient, and thus the argument should not have been barred. In other words, plaintiff contends that the "hypothetical reasonable patient must be clothed with the personal characteristics of the patient whose care is on trial." According to plaintiff, his counsel was "simply trying to inform the jury that a reasonable patient in the shoes of this patient would not have undergone this procedure if told of a risk of death, even if that risk was one percent."

¶ 47 The plaintiff fails to cite any authority for his proposition, and his argument fails to provide an explanation why his counsel's arguments during closing were not improper, particularly in light of the fact that plaintiff acknowledges in his brief that, "[w]hat this particular patient would have done was of course a proper ground for an objection." Therefore, his argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). In any event, for the reasons that follow, plaintiff's argument lacks merit.

¶ 48 The scope and character of closing argument is left to the discretion of the trial judge, who enjoys the best position to view the demeanor of counsel and the atmosphere of the trial. *Rockwood v. Singh*, 258 Ill. App. 3d 555, 558 (1993). Questions as to the prejudicial effect of remarks made during closing argument are within the discretion of the trial court, and determinations as to such questions will not be overturned absent a clear abuse of discretion. *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Petraski v. Thedos*, 2011 IL App (1st) 103218, ¶ 97. In determining whether there has been an abuse of discretion, we may not

substitute our judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely. *Simmons*, 198 Ill. 2d at 568.

¶ 49 In a medical malpractice action raising a lack of informed consent, a plaintiff must prove that a physician "should have informed the patient, prior to administering medical treatment, of the diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." (Internal quotation marks omitted.) *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 53 (quoting *Coryell v. Smith*, 274 Ill. App. 3d 543, 549 (1995)). An informed consent claim employs an objective standard and requires that the plaintiff persuade the jury that a "reasonable person" in her position would have declined to undergo the medical procedure had the additional risk been disclosed. *Davis v. Kraff*, 405 Ill. App. 3d 20, 29-30 (2010).

¶ 50 In this case, it was plaintiff's burden to prove that a reasonable person in Viola's position would have declined to undergo the bronchoscopy and biopsy procedure had the additional risk, that she had a less than one percent chance of death, been disclosed. Our review of the record reveals that counsel's arguments did not focus on the reasonable person in Viola's position, but instead emphasized how Viola's particular character traits and family history would have affected her decision to undergo the procedure. Plaintiff's counsel's statements to the jury implied that the proper legal standard was what Viola would have done had she been informed of the risk of death and, therefore, were misleading. See *Burns v. Michelotti*, 237 Ill. App. 3d 923, 939 (1992) ("In presenting their arguments to the jury, counsel may state what they believe the law to be as long as their remarks are not misleading."). Accordingly, we conclude the trial court did not abuse its discretion when it sustained defense counsel's objections to the statements at issue during plaintiff's closing argument. See *Lounsbury v. Yorro*, 124 Ill. App. 3d 745, 749 (1984) (finding the trial court did not err in sustaining an objection to comment in plaintiff's counsel's closing argument regarding an inapplicable standard of proof).

¶ 51 CONCLUSION

¶ 52 For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

¶ 53 Affirmed.